**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee*,

   v.

DOUGLAS VANCE CROOKED ARM,
    *Defendant-Appellant*.

No. 13-30297

D.C. No.
1:13-cr-00018-
DWM-1

---

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee*,

   v.

KENNETH G. SHANE,
    *Defendant-Appellant*.

No. 13-30316

D.C. No.
1:13-cr-00018-
DWM-2

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, Senior District Judge, Presiding

Argued and Submitted
August 29, 2014—Seattle Washington

Filed June 8, 2015

Before: John T. Noonan, Michael Daly Hawkins,
and Ronald M. Gould, Circuit Judges.

Per Curiam Opinion

**SUMMARY**[*]

### Criminal Law

The panel affirmed in part and reversed in part the district court's denial of a pretrial motion to dismiss for failure to state a felony claim an indictment charging two defendants with violating the Migratory Bird Treaty Act of 1918, vacated the sentences, and remanded.

The defendants argued that the counts to which they conditionally pled guilty were improperly charged as felonies because it is only a misdemeanor under the MBTA to sell migratory bird feathers.

The panel held that even under the defendants' interpretation of the MBTA, Count I, which charges a conspiracy to kill, transport, and offer for sale and sell migratory birds, including bald and golden eagles, charges a felony.

The panel held that in regard to Count II, which charges unlawful trafficking in migratory bird parts, the allegations state a misdemeanor only.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Brian M. Murphy (argued) and Mark D. Parker, Parker, Heitz & Cosgrove, PLLC, Billings, Montana, for Defendant-Appellant Douglas Vance Crooked Arm.

Sherry S. Matteucci, Matteucci Law Firm, PLLC, Billings, Montana, for Defendant-Appellant Kenneth G. Shane.

Leif Johnson (argued), Assistant United States Attorney, Billings, Montana, for Plaintiff-Appellee.

---

**OPINION**

PER CURIAM:

Following conviction and sentencing upon Defendants-Appellants Douglas "Vance" Crooked Arm's and Kenneth Shane's (collectively Defendants) conditional guilty pleas in this case, Defendants appeal the district court's denial of their pretrial Motion to Dismiss Indictment for Failure to State a Felony Claim. We consider the Migratory Bird Treaty Act of 1918 (MBTA). We have jurisdiction under 28 U.S.C. § 1291. We affirm in part, reverse in part, vacate Defendants' sentences, and remand.

**I**

A grand jury indicted Defendants on multiple counts of, among other things, knowingly and willfully conspiring to kill, transport, offer for sale, and sell migratory birds, including bald and golden eagles, in violation of the MBTA, 16 U.S.C. §§ 703(a) and 707(b) (Count I) and unlawfully

trafficking in migratory bird parts, in violation of 16 U.S.C. §§ 703(a), 707(b) (Counts II–IV). Defendants admitted selling a fan made of eagle feathers to undercover agents of the United States Fish & Wildlife Service (FWS) and, after the district court denied Defendants' motion to dismiss the indictment, entered a conditional guilty plea on Counts I and II.

On appeal, as at the district court, Defendants argued that the counts to which they pled guilty were improperly charged as felonies because it is only a misdemeanor under the MBTA to sell migratory bird feathers. We conclude first, that even under Defendants' interpretation of the MBTA, Count I, which charges a conspiracy to kill, transport, and offer for sale and sell migratory birds, including bald and golden eagles, charges a felony; and, second, that in regard to Count II, the allegations state a misdemeanor only, not a felony.

## II

We consider in this section, first, the underlying facts revealed by the government's criminal investigation, and then, second, the procedural history leading to this appeal.

**A[1]**

On August 17, 2008, undercover agents from FWS met Defendants in Crow Agency, Montana, as part of "Operation Hanging Rock," an investigation into the unlawful sale of migratory bird feathers. Shane gave the agents his contact information and invited them to his house.

Seeing two golden eagles flying overhead during a November 2008 meeting with Shane near Garryowen, Montana, one of the undercover agents said to his partner: "There's your tail, Liz." Shane asked whether the agents were "looking for tails," and the female agent said she needed an eagle feather fan for her dress. Shane told her that Crooked Arm "has got some made, beaded and everything. He likes to hunt." Shane said that Crooked Arm caught hawks and eagles by baiting them with deer and elk carcasses.

Shane called Crooked Arm to tell him the agents were interested in eagle feather fans and to ask whether he had any for sale. Crooked Arm came to the meeting, where he showed the agents some deer carcasses in the back of his truck. Upon seeing a golden eagle flying nearby, Shane told Crooked Arm to drop a carcass in the area. Crooked Arm showed the agents two fans—one made from immature

---

[1] This portion of the statement of facts, which describes the government's criminal investigation, is based on the government's Offer of Proof and the sources cited. Because the case was not tried after Defendants' conditional guilty pleas were accepted, there are no findings of fact, only the district court's independent determination that a factual basis for the conditional guilty pleas existed. *See* Fed. R. Crim. P. 11(b)(3).

golden eagle feathers and one made from magpie feathers—before leaving to drop the deer carcass.

After Crooked Arm left, Shane told the agents that he and Crooked Arm wanted $1,500 for the golden eagle fan and $800 for the magpie fan. The agents bought the eagle fan, paying Shane $1,500 in cash, and placed an order for a magpie fan. The agents later saw Shane give Crooked Arm a part of the $1,500 the agents paid for the eagle fan.

On February 11, 2009, one of the agents drove with Shane to Crooked Arm's residence in Hardin, Montana. The agent told Crooked Arm that he needed another eagle fan and a winter hawk fan. Crooked Arm said he had sold four golden eagle fans and several hawk fans the previous week, but that he still had plenty of tails available. He asked the agent to email him the specifics for the fans and gave the agent his phone number. The agent paid Crooked Arm a $500 deposit for the two fans.

On March 8, 2009, Crooked Arm emailed photographs of a bald eagle fan and a winter hawk tail to one of the agents, and asked if the hawk tail—which he planned to use for the agent's fan—was acceptable. Crooked Arm sent a second email later that day, explaining that production of the bald eagle fan had been delayed because the eagle was bloody and required special cleaning. On March 9, 2009, Crooked Arm asked the agents what colors they wanted on the fan. He then called to explain that the $500 deposit would be payment for the winter hawk fan, but that the bald eagle fan from the photo would cost $1,000.

On March 11, 2009, FWS agents served a search warrant on Crooked Arm's residence, where they found, among other

things, a handwritten note documenting the agents' order for a bald eagle fan and a winter hawk fan. Crooked Arm signed an Advice of Rights Form, agreed to cooperate, and admitted that he knew the undercover agents.

On the same day, FWS agents served a search warrant on Shane's father's residence, where Shane lived. Like Crooked Arm, Shane agreed to cooperate, and he conceded that he knew it was illegal to sell hawk and eagle parts. Shane acknowledged that Crooked Arm sold a golden eagle fan to the undercover agents in November 2008, but he said he never counted the money, all of which he gave to Crooked Arm. Shane also admitted having heard the agents discuss future purchases with Crooked Arm, and he said Crooked Arm called him the previous day to ask for the agents' phone number in connection with the sale of the bald eagle tail fan and the hawk fan.

**B**

On February 21, 2013, a grand jury indicted Defendants on four criminal counts. Count I charged Defendants with knowingly and willfully conspiring and agreeing together "to kill, transport, offer for sale, and sell migratory birds, including bald and golden eagles, in violation of 16 U.S.C. §§ 703(a) and 707(b)." Among the overt acts alleged was that Crooked Arm had placed deer carcasses on the land to attract and capture birds of prey including eagles and hawks. The specific conspiracy that Count I charged was the conspiracy defined under 18 U.S.C. § 371. Count II charged that Defendants knowingly sold parts of a golden eagle for $1,500. Count III charged that Defendants offered to sell parts of a Magpie for $800. Count IV alleged that Defendants offered to sell parts of a bald eagle for $1,000.

On April 16, 2013, Defendants filed a motion to dismiss the indictment for failure to state a felony claim. Defendants argued, in essence, that the indictment alleged facts sufficient to support a misdemeanor charge of trafficking in migratory bird *parts* in violation of 16 U.S.C. § 707(a), but that were insufficient to support a felony charge of trafficking in migratory birds in violation of 16 U.S.C. § 707(b).

The district court denied Defendants' motion on July 8, 2013, and said that Defendants were "misconstru[ing] the statute under which [they] are charged." The district court ruled that the "indictment properly states a felony crime," because 16 U.S.C. § 707(b) "is designed to punish the commercial sale of migratory birds, not to distinguish between birds and bird parts." The district court held that although Defendants "sold parts of birds and not whole birds, it is the commercial sale of the parts that elevates the Defendants['] offense from a misdemeanor to a felony."

On July 22, 2013, Crooked Arm and Shane entered identical conditional guilty pleas to Counts I and II, reserving their right to appeal the district court's denial of their motion to dismiss the indictment for failure to state a felony claim.

On October 23, 2013, the district court entered judgment sentencing Crooked Arm to four years of probation and Shane to one year of probation. Crooked Arm appealed his conviction and the district court's denial of his motion to dismiss the indictment for failure to state a felony claim, the

same day. Shane likewise appealed on the same grounds on November 1, 2013.**[2]**

## III

We review *de novo* a district court's decision "whether to dismiss a charge in an indictment based on its interpretation of a federal statute." *United States v. Olander*, 572 F.3d 764, 766 (9th Cir. 2009). Similarly, we review *de novo* questions of statutory interpretation. *See United States v. Thompson*, 728 F.3d 1011, 1015 (9th Cir. 2013). We normally give deference "to an executive department's construction of a statutory scheme it is entrusted to administer" when the statute is ambiguous. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

## IV

We begin with an overview of the MBTA. Congress passed the MBTA in 1918 to protect migratory birds, "or any part, nest, or egg of any such bird," included in the terms of a 1916 treaty between the United States and Great Britain, which was acting on behalf of Canada. *See* MBTA, ch. 128, § 2, 40 Stat. 755, 755 (1918), now codified as amended at 16 U.S.C. §§ 703–712.**[3]** The treaty stated that migratory birds

---

**[2]** Defendants did not admit to all facts alleged in the Offer of Proof but conceded that they "conspired to sell and actually sold" a golden eagle fan "made with migratory bird parts." Their argument on appeal is the legal contention that what they did was misdemeanor and not felony conduct.

**[3]** The MBTA later incorporated elements of similar bilateral treaties between the United States and Mexico, Japan, and the Soviet Union. *See* 16 U.S.C. § 703(a). Pertinent here, eagles, which were not originally covered under the MBTA, became protected by the statute in 1972. *See*

in North America were "in danger of extermination through lack of adequate protection," and called for "insuring the preservation of such migratory birds" by saving them from "indiscriminate slaughter." Convention for the Protection of Migratory Birds, U.S.-Gr. Brit., Aug. 16, 1916, 39 Stat. 1702, 1702.    And it banned the sale, or attempted sale, of "migratory nongame birds" or their eggs without exception. *Id.* arts. II, VII.

The conduct proscribed by the MBTA has not changed much since 1918.  Today, the statute states that, with certain exceptions not applicable here, "it shall be unlawful at any time, by any means or in any manner, to":

> pursue, hunt, take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase, deliver for shipment, ship, export, import, cause to be shipped, exported, or imported, deliver for transportation, transport or cause to be transported, carry or cause to be carried, or receive for shipment, transportation, carriage, or export, *any migratory bird, any part, nest, or egg of any such bird*, or any product, whether or not manufactured, which consists, or is composed in whole or part, of any such bird or any part, nest, or egg thereof.

16 U.S.C. § 703(a) (emphasis added).    FWS, which administers the MBTA, defines "migratory bird[s]" to include

---

*United States v. Mackie*, 681 F.2d 1121, 1123 (9th Cir. 1982) ("Obviously, eagles are protected by the MBTA.").

bald eagles, golden eagles, magpies, and many species of hawk. *See* 50 C.F.R. § 10.13. FWS regulations also state that a "[m]igratory bird" for MBTA purposes means any species listed in § 10.13, "including any part, nest, or egg of any such bird, or any product" consisting "in whole or part, of any such bird or any part, nest, or egg thereof." *Id.* § 10.12.

The punishment scheme for violations of the MBTA has changed over time. Originally, all violations were misdemeanors. *See* MBTA, ch. 128, § 6, 40 Stat. 755, 756 (1918). In 1960, however, Congress amended the MBTA to make it a felony (1) to "take by any manner whatsoever any migratory bird with intent to sell, offer to sell, barter or offer to barter such bird," or (2) to "sell, offer for sale, barter or offer to barter, any migratory bird." Act of Sept. 8, 1960, Pub. L. No. 86-732, 74 Stat. 866, 866. Congress again amended the MBTA in 1986, this time to add a scienter requirement to the felony provision of § 707. *See* Emergency Wetlands Resources Act of 1986 § 501, Pub. L. No. 99-645, 100 Stat. 3582, 3590.

Today, then, the MBTA treats some violations as misdemeanors and others as felonies:

> (a) Except as otherwise provided in this section, any person, association, partnership, or corporation who shall violate any provisions of said conventions or of this subchapter, or who shall violate or fail to comply with any regulation made pursuant to this subchapter shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined not more than $15,000 or be imprisoned not more than six months, or both.

(b) Whoever, in violation of this subchapter, shall knowingly—

(1) take by any manner whatsoever any migratory bird with intent to sell, offer to sell, barter or offer to barter such bird, or

(2) sell, offer for sale, barter or offer to barter, any migratory bird shall be guilty of a felony and shall be fined not more than $2,000 or imprisoned not more than two years, or both.

16 U.S.C. § 707(a)–(b).

## V

We start with Count I. We conclude that this count plainly charged a felony. The felony provisions of § 707(b) are clearly invoked when someone takes a migratory bird with intent to sell it. Here, Count I alleged that Defendants "knowingly and willfully conspired . . . to kill, transport, offer for sale, and sell migratory birds, including bald and golden eagles, in violation of 16 U.S.C. §§ 703(a) and 707(b)." The overt acts that were alleged included that Crooked Arm had "placed deer carcasses on the land in order to attract and capture birds of prey, including eagles and hawks."

Count I formally charges Defendants with a conspiracy under 18 U.S.C. § 371,[4] which makes it a crime for "two or

---

[4] The MBTA does not define a separate conspiracy offense. Here, Count I charges a conspiracy under 18 U.S.C. § 371, which the Supreme Court and our court have called the "general conspiracy statute." *United*

more persons" to, among other things, conspire to "commit any offense against the United States . . . and one or more of such persons do any act to effect the object of the conspiracy." 18 U.S.C. § 371. Section 371 generally felonizes conspiratorial conduct committed under that provision. However, § 371 further states that if the offense, "the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor." *Id.*

Under any reading of the statute, even if Defendants were right that sale of eagle feathers is only a misdemeanor, Count I clearly charges in part a statutory felony under 18 U.S.C. § 371. This is because Count I charges a conspiracy to "kill, transport offer for sale, and sell migratory birds, including bald and golden eagles," conduct that falls within the MBTA's felony provisions. And the overt acts alleged included placing deer carcasses to attract birds of prey. The substantive MBTA offense, "the commission of which is the object of the conspiracy," makes Count I a felony charge under 18 U.S.C. § 371. 18 U.S.C. § 371. We hold that Count I, to which Defendants pled guilty, charged a felony offense.[5]

---

*States v. Shabani*, 513 U.S. 10, 14 (1994); *United States v. Garcia-Santana*, 774 F.3d 528, 535 (9th Cir. 2014).

[5] In their supplemental briefing to this court after oral argument, Defendants raised for the first time a challenge to the adequacy of their guilty pleas with regard to Count I. Defendants never moved in the district court to withdraw their guilty pleas. Normally, we will not consider an issue first raised on appeal and not presented to the district court. Bennett Evan Cooper, *Federal Appellate Practice: Ninth Circuit* § 19:2 (2014–2015 ed.); *see, e.g.*, *Vision Air Flight Serv. v. M/V Nat'l Pride*, 155 F.3d 1165, 1168 (9th Cir. 1998) (issue not presented to or

## VI

Before considering challenges to whether Count II alleged facts sufficient to charge a felony, we first ask whether the conclusion that Count I charged a felony renders moot the challenge to whether Count II charged a felony. The challenge to the felony status of Count II is not moot for two reasons.

First, if Defendants prevail on this appeal, we could give relief by vacating their sentences and remanding for resentencing. The District Court sentenced on the basis that Defendants pled guilty to Counts I and II, and thus committed two felony offenses. The district court gave a light sentence of probation—four years for Crooked Arm and one year for Shane. The district court was aiming at giving a light sentence, even for conviction of two felony counts, but it

---

decided by district court, and as to which no factual record had been developed, would not be considered on appeal); *Slaven v. Am. Trading Transp. Co.*, 146 F.3d 1066, 1069 (9th Cir. 1998) (appellate court will not consider issues not properly raised before district court). Also, Defendants did not contend in their opening brief before us that their pleas were inadequate in factual basis or in understanding. The sole issue raised in their opening brief questioned whether the sale of a "family heirloom fan (containing a few feathers)" was a felony. Because no challenge to the guilty pleas was raised in the opening brief, we consider any such challenge to be waived. Cooper, *Federal Appellate Practice*, *supra*, at § 19:8; *see, e.g.*, *Stanford Ranch, Inc. v. Md. Cas. Co.*, 89 F.3d 618, 628 n.5 (9th Cir. 1996); *Dilley v. Gunn*, 64 F.3d 1365, 1367 (9th Cir. 1995) (issues not raised in the opening brief usually are deemed waived). Moreover, the record before us does not permit a conclusion that Defendants' pleas were not knowing and voluntary and without adequate factual basis. We express no opinion about whether on a different factual showing, presented with a motion under 28 U.S.C. § 2255, Defendants might have any basis to withdraw their pleas, avoid the plea agreements, and gain vacatur of their convictions and sentences.

could have given an even lighter sentence, such as less time for probation, if it had concluded that Defendants pled guilty to only one felony and to one misdemeanor, rather than to two felonies.

Second, the fact of conviction for two felonies, rather than one felony and one misdemeanor, has collateral consequences for Defendants. If either is convicted of any other federal offense in the future, his advisory sentencing guidelines range would be affected by criminal history, and that is affected by whether he pled guilty to one felony or two. In general, the greater the criminal history category in which one fits, the greater will be the applicable advisory guidelines sentencing range. We have said: "In this day of federal sentencing guidelines based on prior criminal histories [and] federal career criminal statutes" the presumption that "collateral consequences" flow from a criminal conviction is irrebuttable. *Chacon v. Wood*, 36 F.3d 1459, 1463 (9th Cir. 1994) *overruled on other grounds by statute*, 28 U.S.C. § 2253(c).

Having determined that Count I charged a felony, we still must address whether Count II charged a felony. That question is not moot and will affect both whether Defendants are entitled to a resentencing as a result of our appellate decision and whether their criminal histories thereafter will reflect one or two felonies arising from the offenses to which they pled guilty in this case.

## VII

Turning to the remainder of the indictment, it is undisputed that Counts II through IV charge criminal conduct. *See Andrus v. Allard*, 444 U.S. 51, 60 (1979)

("[16 U.S.C. § 703] is naturally read as forbidding transactions in all bird parts, including those that compose pre-existing artifacts."). As with Count I, the question is whether the charged conduct amounts to a misdemeanor under § 707(a) or a felony under § 707(b). This turns on whether the sale of a fan made of migratory bird feathers constitutes the sale of a "migratory bird." We conclude that it does not.

## A

As with all issues of statutory interpretation, we begin with the text of the MBTA. *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 830–31 (9th Cir. 1996). We examine not only § 707(b), but also the MBTA as a whole, which consists of ten sections codified at 16 U.S.C. §§ 703 through 712, and its purpose. *Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (court considers "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole"). We may consider legislative history if the statute is ambiguous or if "the legislative history clearly indicates that Congress meant something other than what it said." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (en banc) (quoting *Perlman v. Catapult Entm't, Inc.*, 165 F.3d 747, 753 (9th Cir. 1999)).

As outlined in Section IV of this opinion, it is a felony: (1) to take any "migratory bird" with the intent to sell, offer for sale, barter, or offer to barter such bird; or (2) to sell, offer for sale, barter, or offer to barter any "migratory bird." 16 U.S.C. § 707(b). Defendants contend that the term "migratory bird" as used in § 707(b) refers to the bird as a

whole and does not also mean feathers or a product containing migratory bird feathers.  The Government contends that the term "migratory bird" also includes migratory bird parts and products containing migratory bird parts.

"Migratory birds," as the phrase is used in the MBTA, "are those defined as such by the treaty between the United States and Great Britain" and other relevant treaties.  *Id.* § 715j (defining "migratory bird" for purposes of the Migratory Bird Conservation Act and MBTA).  The relevant treaties generally define "migratory birds" with reference to particular species of birds, e.g., ducks, cranes, herons. *See* Convention for the Protection of Migratory Birds, U.S.-Gr. Brit., art. I, Aug. 16, 1916, 39 Stat. 1702.  Consistent with the definition contained in § 715j and the relevant treaties, the common definition of the term "bird" is "any of a class (Aves) of warm-blooded vertebrates distinguished by having the body more or less completely covered with feathers and the forelimbs modified as wings." MERRIAM–WEBSTER: DICTIONARY, *available at* http://www.merriam-webster.com/dictionary/bird.  Except in the limited context of cookery, in which the term "bird" may refer more specifically to a piece of meat, the term "bird" refers to a member of the species rather than a part of the individual animal.  *Id.*

Because the MBTA uses the phrase "migratory birds" in numerous provisions, we endeavor to interpret the phrase in a manner that gives it a consistent meaning throughout the statute. *Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2012). Throughout the broader context of the MBTA, Congress consistently differentiated between "migratory birds" and "parts thereof":

[I]t shall be unlawful . . . [to] take, capture, kill, attempt to take, capture, or kill, possess, offer for sale, sell, offer to barter, barter, offer to purchase, purchase . . . *any migratory bird, any part, nest, or egg of any such bird, or any product* . . . which consists, or is composed in whole or part, *of any such bird or any part, nest, or egg thereof*.  16 U.S.C. § 703(a) (emphasis added).

[T]he Secretary of the Interior is authorized and directed . . . to determine when, to what extent, if at all, and by what means, it is compatible with the terms of the conventions to allow hunting, taking, capture, killing, possession, sale, purchase, shipment, transportation, carriage, or export of *any such bird, or any part, nest, or egg thereof* . . . . *Id.* § 704(a) (emphasis added).

It shall be unlawful to ship, transport, or carry . . . from one State, Territory, or district to or through [another] . . . *any bird, or any part, nest, or egg thereof* . . . . It shall be unlawful to import *any bird, or any part, nest, or egg thereof*, captured, killed, taken, shipped, transported, or carried at any time contrary to the laws . . . of Canada . . . . *Id.* § 705 (emphasis added).

*All birds, or parts, nests, or eggs thereof*, captured, killed, taken, sold or offered for sale, bartered or offered for barter, purchased, shipped, transported, carried, imported,

exported, or possessed contrary to the provisions of this subchapter . . . shall, when found, be seized . . . . *Id.* § 706 (emphasis added).

Whoever, in violation of this subchapter, shall knowingly—(1) take by any manner whatsoever ***any migratory bird*** with intent to sell, offer to sell, barter or offer to barter ***such bird***, or (2) sell, offer for sale, barter or offer to barter, ***any migratory bird*** shall be guilty of a felony . . . . *Id.* § 707(b) (emphasis added).

All guns, traps, nets and other equipment . . . used by any person when engaged in pursuing, hunting, taking, trapping, ensnaring, capturing, killing or attempting to take, capture, or kill ***any migratory bird*** in violation of this subchapter with the intent to offer for sale, or sell or offer for barter, or barter ***such bird*** . . . may be seized . . . . *Id.* § 707(c) (emphasis added).

The grammatical composition of these provisions is instructive. *See U.S. ex rel. Bly-Magee v. Premo*, 470 F.3d 914, 918 (9th Cir. 2006). Importantly, Congress never joined the phrases "migratory birds" and "parts, nests, or eggs thereof" with the word "including," the use of which may have indicated that the phrase "migratory birds" also encompasses its parts and products. Instead, the MBTA repeatedly separates the phrases "migratory birds" and "parts, nests, or eggs thereof" with the disjunctive "or," which tells us that the phrases have separate meanings. *See Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014) (use of "or" "is

almost always disjunctive, that is, the words it connects are to be given separate meanings" (internal quotation marks and citation omitted)); *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 739–40 (1978) (interpreting series of words written in disjunctive and reasoning that statute's use of "or" implied that each word in series had separate meaning).[6]

Interpreting the phrases "migratory birds" and "parts, nests, or eggs thereof" as having distinct meanings comports with other fundamental canons of statutory construction. Indeed, Congress demonstrated time and again that it knew how to specify when a provision of the MBTA applies to "migratory birds"; to "parts, nests, or eggs" of migratory birds; to products consisting of migratory bird parts; or to all three categories. Yet, Congress omitted all language relating to "parts, nests, or eggs" of migratory birds and products from Section § 707(b), making it a felony only to "take . . . *any migratory bird* with intent to sell . . . or sell, offer for sale, barter or offer to barter, *any migratory bird* . . . ." 16 U.S.C. § 707(b) (emphasis added). Under the longstanding canon *expressio unius est exclusio alterius*, we presume that the exclusion of the phrases "parts, nests, or eggs thereof" and "products . . . consisting . . . of parts, nests, or eggs thereof" from § 707(b) was intentional. *Loughrin*, 134 S. Ct. at 2390; *Crandon v. United States*, 494 U.S. 152, 163–64 (1990) (where Congress included unambiguous language to cover preemployment payments in two sections of statute, absence

---

[6] The Government effectively asks us to give the term "migratory birds" two different meanings within the same section of the MBTA. Although the Government contends that the use of "migratory birds" in § 707(b) must also mean "any part, nest, egg thereof" or any product consisting of any part thereof, it is illogical to apply that same meaning to the term "migratory bird" as it is used in § 707(c), which permits seizure of any equipment used to "take, capture, or kill any migratory bird."

of comparable language in third section indicated that Congress did not intend for that section to apply to preemployment payments).

Adhering to the *expressio unius* canon and interpreting the phrases to have separate meanings further ensures that all words and phrases in the statute have effect.  *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal quotation marks and citation omitted)).

The Government's interpretation, on the other hand, renders the language "parts, nests, or eggs thereof" superfluous, not only in one instance but in four different provisions of the MBTA—a result that our rules of statutory interpretation strongly disfavor.  *See United States v. Thum*, 749 F.3d 1143, 1147 (9th Cir. 2014) (rejecting broad interpretation of statutory term where interpretation would effectively "leave no work to be done" by preceding phrase); *United States v. Wenner*, 351 F.3d 969, 974–75 (9th Cir. 2003) (declining to interpret "crime of violence" as including all burglaries because doing so would render separate enhancement for "burglary of a dwelling" mere surplusage).

When read in context and evaluated under traditional canons of construction, the plain meaning of § 707(b) indicates that the sale of a fan containing migratory bird feathers is not a felony.

**B**

We recognize, however, that our inquiry does not end at the plain meaning of the statute if giving effect to the plain meaning would lead to an absurd result or would be contrary to the clearly expressed intent of Congress. *Avendano-Ramirez v. Ashcroft*, 365 F.3d 813, 816 (9th Cir. 2004) (citing *Or. Natural Res. Council, Inc. v. Kantor*, 99 F.3d 334, 339 (9th Cir. 1996)). The Government argues that the purpose of the MBTA is to make all commercialization of migratory birds a felony, such that the term "migratory bird" in § 707(b) must be interpreted to include all migratory bird parts and products made from the same.

Most of the cases upon which the Government relies merely state an undisputed principle: It is a crime under the MBTA to traffic in migratory birds, their parts, or products derived from migratory birds or their parts. To the extent those cases suggest that the sale of migratory bird parts or products is a felony, they do so in unexplained dicta. For example, in *United States v. Mackie*, 681 F.2d 1121 (9th Cir. 1982), we considered whether the government must prosecute crimes involving the sale of eagles and eagle parts under the Bald and Golden Eagle Protection Act ("BGEPA") rather than the MBTA. *Id.* at 1122. We stated, "The MBTA, 16 U.S.C. ss 703, 707(b), and the BGEPA, 16 U.S.C. s 668(a), prohibit offering to sell or selling eagles or parts of eagles." *Id.* Although we cited to § 707(b), we did not consider or discuss whether the sale of eagle parts alone constituted a misdemeanor or a felony.

In *United States v. Wulff*, 758 F.2d 1121 (6th Cir. 1985), the Sixth Circuit considered whether the absence of a scienter requirement under § 707(b) violated due process. The felony

conviction in *Wulff* involved the sale of a necklace made in part of red-tailed hawk and great-horned owl talons. *Id.* at 1122. Although the case involved the sale of migratory bird parts, the Sixth Circuit specifically stated that the Government's argument that the charged conduct was "exactly the type of commercialization of protected birds Congress sought to punish as a felony" was not the issue before the court. *Id.* at 1124–25.

The Third Circuit considered the same due process issue in *United States v. Engler*, 806 F.2d 425 (3rd Cir. 1986). There, the court explained that the MBTA "presents two factual scenarios for imposing strict liability on those who hunt migratory birds—if the actor hunts for pleasure, it is a misdemeanor; if for commercial purposes it is a felony." *Id.* at 431. The court noted in its recitation of facts that the defendant was found guilty of trafficking in migratory birds and migratory bird parts in violation of § 703(a) and § 707(b), but it did not discuss whether the sale of migratory bird parts was properly charged as a felony. *Id.* at 427.

The only reported case to directly address the issue before us is an out-of-circuit district court decision, *United States v. St. Pierre*, 578 F. Supp. 1424 (D.S.D. 1983). *St. Pierre* held that the sale of an invitation stick containing migratory bird feathers constituted a felony. *Id.* at 1426. Relying on legislative history, the court reasoned that "[i]t is the commercialization in migratory game birds, of whatever nature, that Congress addressed with the 1960 amendment." *Id.* at 1427. Accordingly, the court determined that the "term 'migratory bird' in § 707(b) includes a whole bird as well as any part thereof." *Id.* The court explained that any other interpretation would lead to the absurd result of allowing an

individual who kills 100 migratory birds to escape felony punishment by simply dismembering the birds.  *Id.*

We disagree.  Treating the sale of a fan containing migratory bird feathers as a misdemeanor does not lead to an absurd result under the MBTA.  Individuals who kill or take migratory birds with the intent to sell the birds have committed a felony regardless of whether or how they subsequently sell the migratory birds.  Individuals who sell migratory birds also commit a felony under the MBTA.  Individuals who sell exclusively feathers of a migratory bird or a product containing migratory bird feathers have also committed a crime under the MBTA, albeit punishable as a misdemeanor that is subject to a $15,000 fine and six-month prison term.  And, individuals who purchase a migratory bird or migratory bird parts have also committed a crime under the MBTA, again punishable as a misdemeanor.  16 U.S.C. §§ 703(a), 707.  Thus, the MBTA still protects against the commercialization and destruction of migratory birds in all regards.

Nor is the legislative history of § 707 as clear as the Government or *St. Pierre* would suggest.  The original bill proposing the 1960 amendment to § 707 did not split the available penalties into misdemeanor and felony categories. S. REP. NO. 86-1779, at 2–3 (1960) (reprinting letter discussing original bill).  Rather, the bill proposed an increase to the available penalty from a maximum $500 fine and six months in prison to a maximum $1000 fine and two years in prison while still punishing all violations of the MBTA as misdemeanors.  *Id.*  The bill also proposed adding a subsection that would allow courts to order the seizure of equipment used by violators to hunt or trap migratory birds. *Id.*

The purpose of the1960 amendment, as indicated by the statutory text and House and Senate Committee Reports, was to increase available penalties for those who engage in the killing of migratory birds for sale, not necessarily those engaged in the sale of migratory bird parts or products. H.R. REP. NO. 86-1787, at 1 (1960) ("The purpose of this bill is to authorize more severe penalties for persons who engage in the killing of migratory birds for sale."); S. REP. NO. 86-1779, at 1 ("The basic need for this legislation is the necessity to better protect our migratory birds . . . This bill would authorize more severe penalties for these market hunters . . . .").

In a May 1960 hearing on the original bill, subcommittee members and proponents of the bill discussed the killing and sale of whole birds. *Increased Penalties for Violations of Migratory Bird Treaty Act: Hearing on H.R. 11430 and H.R. 11674 Before the Subcomm. on Fisheries and Wildlife Conservation of the H. Comm. on Merchant Marine and Fisheries*, 86th Cong. 2 (1960).  For example, while discussing instances in which harsher penalties were needed, Representative George P. Miller and Charles Lawrence, the Assistant Chief of the Branch of Management Enforcement for the Bureau of Sports Fisheries of the Department of the Interior, had the following exchange:

> Representative Miller:
>
>> What does the market hunter get for the birds?  For what does he sell the birds?

Mr. Lawrence:

> Generally for from $1.25 to $2 a bird or a
> duck and up to $5 for a goose.

Representative Miller:

> So that, if he is fined $500, and he takes
> 100 birds a day, that is about 2 days' work
> or 2½ days' work to pay the fine?

Mr. Lawrence:

> Yes, sir.  In some areas the conditions are
> such that 500 to 700 birds can be killed in
> 6 seconds and the sale of those birds at
> $1.25 or $2 brings him quite a return, sir.

*Id.* at 5–6.  Mr. Lawrence also mentioned that some market hunters in Illinois had informed an undercover agent that they could provide the agent with 10,000 birds per year.  *Id.* at 8.

Hearing attendees expressed doubt, however, about the effectiveness of the amendment to actually deter market hunters for two reasons.  First, courts often were not imposing the maximum available penalties under the existing statute. *Id.* at 5, 7 (statement of Alton Lennon, Subcomm. on Fisheries and Wildlife Conservation).   Second, the amendment applied equally to market hunters and sport hunters that might mistakenly exceed the scope of their hunting permits.  *Id.* at 19–20 (statements of Rep. Lennon and Daniel H. Janzen, Dir. Bureau of Sport Fisheries and Wildlife).  In response to these concerns, a new bill was drafted, which included the felony punishment provision that

eventually became § 707(b).  H.R. REP. NO. 86-1787, at 2 (explaining progression of proposed legislation to increase penalties under MBTA).

The revised bill made the taking of migratory birds with the intent to sell, the sale of migratory birds, and the purchase of migratory birds felonies.  *Id.*  Reports indicate that the revised bill was intended to authorize penalties for market hunters that are more severe than those applicable to sport hunters.  *Id.*  Prior to enactment, Congress modified the bill so that the purchase of migratory birds remained a misdemeanor, indicating that the bill did not target all commerce in migratory birds.  S. REP. NO. 86-1779, at 2. Indeed, when proposing the final amendment, the Senate Committee Report explained, "[W]e are not convinced that every purchaser of migratory birds should be exposed to such a heavy penalty."  *Id.*

Congress again amended § 707 in 1986 to add a scienter requirement to the felony provision of § 707(b).  The Senate Committee Report explained that the "amendment will require proof that the defendant knew (1) that his actions constituted a taking, sale, barter, or offer to sell or barter, as the case may be and (2) that the item so taken, sold, or bartered was a bird *or portion thereof*."  S. REP. NO. 99-445, at 16 (1986) (emphasis added).  The report does not further discuss the scope or purpose of § 707(b).

The most recent revision to § 707 occurred in 1998.  In part, that amendment increased the available fine for misdemeanor violations from $500 to $15,000.  16 U.S.C. § 707(a); H.R. REP. NO. 105-542, at 2 (1998).   When outlining the background and need for the 1998 amendments, the House of Representatives Committee Report discussed

the meaning of "migratory bird": "What is a migratory bird? Under the Convention, the term 'migratory bird' means all wild species of ducks, geese, brants, coots, gallinules, rails, snipes, woodcocks, crows, and mourning and white-winged doves." *Id.* at 2. Like the 1986 report, the 1998 report does not elaborate on the scope of § 707(b).

At best, the legislative history is inconclusive. It is clear that the sponsors of the 1960 amendment were concerned with deterring market hunters, and proponents of the amendment discussed the sale of birds as a whole rather than migratory bird parts or related products. And, by removing the purchase of migratory birds from the scope of § 707(b), Congress indicated that it did not intend to punish all commercial acts involving migratory birds as felonies.[7] Consequently, the 1960 legislative history, which is entitled to the greatest weight, does not provide "convincing" evidence that the term "migratory birds" also means "parts, nests, or eggs thereof" and related products. *Church of Scientology of Cal. v. U.S. Dep't of Justice*, 612 F.2d 417, 422 (9th Cir. 1979). The 1986 Senate Committee Report interpreted § 707(b) as applying to the sale of bird parts,

---

[7] The Government relies heavily on the portion of the 1960 amendment's legislative history providing that the increase in penalties was "a more effective means of dealing with market hunters and with others who commercialize in migratory game birds." The Government suggests that the reference to "others who commercialize in migratory game birds" is a clear indication that Congress intended the 1960 amendment to apply to the sale of migratory bird parts. Yet, the quoted statement was not made by a member of Congress. Instead, it was made by the Department of the Interior in a report to the House Committee expressing the Department's support for the 1960 amendment. *See, e.g.*, S. REP. NO. 86-1849, at 2 (providing copy of agency report). As such, we do not find it particularly probative on the issue of Congress' intent.

which supports the Government's position here. Yet, the 1998 House Committee Report interpreted "migratory birds" to mean specific species of birds, which supports our interpretation of the statute's plain meaning. As post-enactment legislative history, however, the 1986 and 1998 reports are not entitled to great weight. *Nw. Forest Res. Council*, 82 F.3d at 836.

Certainly our goal in interpreting any statute is to give effect to the intent of Congress. *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015). But neither the text of the statute nor the legislative history indicate that Congress intended for the sale of a fan containing migratory bird feathers to constitute a felony rather than a misdemeanor. Given the clarity of the statutory text and the absence of documentation indicating Congress' intent to act otherwise, we cannot read into § 707(b) what Congress did not draft.

## C

Finally, to the extent that ambiguity did exist, the rule of lenity would support our conclusion. *See Burrage v. United States*, 134 S. Ct. 881, 891 (2014) ("Especially in the interpretation of a criminal statute subject to the rule of lenity, we cannot give the text a meaning that is different from its ordinary, accepted meaning, and that disfavors the defendant." (internal citation omitted)); *United States v. Corbin Farm Serv.*, 578 F.2d 259, 260 (9th Cir. 1978) (adopting opinion of district court applying rule of lenity to determine that single act resulting in death of multiple migratory birds constituted single violation of MBTA).

While we interpret the plain meaning of § 707 to indicate that Congress intended for the sale of a product containing

migratory bird feathers to be a misdemeanor, we also recognize the logic of maximizing penalties to chill market demand for any product that drives illegal commercial hunting. The overall statutory purpose and logic of tying the severity of penalties to the marketplace in general may narrowly allow a second permissible reading of the statute. The rule of lenity directs us to resolve ambiguity in favor of Defendants by punishing their acts as misdemeanors rather than felonies. *United States v. LeCoe*, 936 F.2d 398, 402 (9th Cir. 1991) (applying rule of lenity to determine whether defendant's conduct amounted to a misdemeanor or felony).[8]

Our holding reaches only the facts and issue before us, whether the sale of a fan containing migratory bird feathers constitutes the sale of a "migratory bird" within the meaning of § 707(b). Considering the plain language of the MBTA and being mindful of the criminal application of the statute, we conclude that Counts II through IV of the indictment charge misdemeanors rather than felonies. The district court

---

[8] The Government asks us to defer to the FWS interpretation of "[m]igratory bird," which defines the term as "any [listed] bird . . . including any part, nest, or egg of such bird, or any product, whether or not manufactured, which consists or is composed in whole or part, of any such bird or any part, nest, or egg thereof." 50 C.F.R. § 10.12. Because application of the "traditional tools of statutory interpretation" yields a clear meaning, deference to FWS's definition under the rule of *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1997), is not warranted in this case. *Id.* at 843 n.9; *I.N.S. v. St. Cyr*, 533 U.S. 289, 320 n.45 (2001) (finding *Chevron* inapplicable because no ambiguity remained after applying traditional rule that statute which is ambiguous with respect to retroactive application is construed to be unambiguously prospective). In other circumstances, however, where ambiguity persists, further evaluation of *Chevron* deference rather than application of the rule of lenity may be appropriate. *Pacheco-Camacho v. Hood*, 272 F.3d 1266, 1271–72 (9th Cir. 2001).

should have granted Defendants' motion with regard to those counts.

## VIII

Count I charged a felony. Count II charged a misdemeanor. The district court should have denied the motion to dismiss, as it did, with regard to Count I. But the district court should have granted the motion to dismiss with regard to Count II. Accordingly, on this appeal pursuant to the conditional guilty plea, we affirm in part, as to Count I, but reverse in part as to Count II. We also vacate the sentence on both Counts, vacate the felony conviction on Count II, and remand for proceedings consistent with this opinion. On remand, the Defendants are given the option to withdraw their guilty pleas with regard to Count II, Fed. R. Crim. P. 11(a)(2), or the district court may consider whether to resentence their convictions on that count as misdemeanors.

**AFFIRMED in part, REVERSED in part, VACATED in part, and REMANDED.**