**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

NEIL THOMSEN,
*Defendant-Appellant.*

No. 13-50235

D.C. No.
3:10-CR-02810-BEN

OPINION

Appeal from the United States District Court
for the Southern District of California
Roger T. Benitez, District Judge, Presiding

Argued and Submitted June 8, 2016
Pasadena, California

Filed July 28, 2016

Before: Stephen Reinhardt and Kim McLane Wardlaw,
Circuit Judges, and Mark W. Bennett, Senior District
Judge.[*]

Opinion by Judge Bennett

---

[*] The Honorable Mark W. Bennett, Senior District Judge for the U.S. District Court for the Northern District of Iowa, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed in part, reversed in part, and remanded in a case in which the defendant, a tax preparer, was convicted of 32 federal offenses arising from a tax fraud scheme.

The panel held that 18 U.S.C. § 1546(a) (fraud and misuse of visas, permits, and other documents) does not apply to documents that are not immigration-related, such as U.S. passports or U.S. passport cards, and that the district court therefore erred by denying the defendant's motion for judgment of acquittal as to Count 33, which charged a violation of § 1546(a), and Count 34, which charged aggravated identity theft during and in relation to the felony passport card fraud offense.

The panel held that the district court did not err, as a matter of law, in concluding that awarding restitution for related conduct beyond the conduct for which the defendant was specifically convicted was within statutory bounds. But the panel held that the district court clearly erred, on a question of fact, in finding that the conduct at issue in a second case, in which the defendant was not convicted, was sufficiently "related" to the conduct at issue in the first case to warrant inclusion of losses in the order for restitution pursuant to 18 U.S.C. § 3663A(a)(2).

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court erred by using the 2011 rather than the 2008 version of U.S.S.G. § 2B1.1(b)(2)(C) to calculate the number of victims at sentencing.

The panel held that the primary flaw with the district court's "intended loss" finding under U.S.S.G. § 2B1.1(b)(1) is that the district court improperly considered the intended loss from the second case, which did not result in the defendant's conviction, even though that case did not involve "relevant conduct" because it was not "part of the same course of conduct or common scheme or plan as the offense of conviction." The panel wrote that furthermore the United States nowhere identifies evidence establishing—or identified by the district court as the basis for the finding—that specific challenged amounts of intended loss in the first case were, in fact, actual or intended loss.

Noting the absence of any authority holding that tax returns are "means of identification," the panel held that the district court improperly imposed an enhancement, U.S.S.G. § 2B1.1(b)(10) (2008), for using social security numbers of others to produce personal tax returns.

The panel held that the district court properly applied a sophisticated means enhancement, U.S.S.G. § 2B1.1(b)(9)(C) (2008).

The panel wrote that because it vacated the conviction on Count 33, U.S.S.G. § 2L2.2(c)(1)(A)'s cross-reference to U.S.S.G. § 2X1.1 is inapplicable.

The panel held that the district court did not plainly err in applying an "abuse of trust" enhancement under U.S.S.G.

§ 3B1.3, where persons in whose name the defendant filed fraudulent tax returns by using personal information provided to him in his employment as a tax preparer were subject to emotional and other burdens as a result of his conduct.

The panel held that the district court did not err in applying an enhancement for "obstruction of justice" under U.S.S.G. § 3C1.1.

## COUNSEL

Gail Ivens (argued), Deputy Federal Public Defender; Hilary L. Potashner, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Defendant-Appellant.

Joseph J.M. Orabona (argued), Assistant United States Attorney; Peter Ko, Chief, Appellate Section, Criminal Division; Laura E. Duffy, United States Attorney; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

## OPINION

BENNETT, Senior District Judge:

On July 14, 2010, Neil Thomsen, then a 67-year-old retired engineer turned tax preparer, was charged, as the sole defendant, with 34 federal offenses arising from a tax fraud scheme. On December 8, 2011, a jury convicted him of 32 of those offenses, after the prosecution withdrew two. He was sentenced to fifteen years of imprisonment and ordered to pay just over $500,000 in restitution. He now appeals his conviction of two offenses, the restitution order, and the calculation of his advisory guidelines sentencing range. We affirm in part, reverse in part, and remand for further proceedings.

## I. INTRODUCTION

### A. Charges And Conviction

The charges against Thomsen arose from an alleged tax fraud scheme, beginning on a date unknown and continuing through about April 15, 2009, that is, for the 2009 tax season relating to the 2008 tax year. The Indictment alleged the essence of the scheme was "that defendant THOMSEN fraudulently used the personal identification, including names and [social security numbers], of individuals, for whom he prepared tax returns or who had their tax returns prepared by an entity where defendant THOMSEN was employed, in order to file false income tax returns with the IRS and to obtain tax refunds and tax preparation fees to which he was not entitled." Indictment, ¶ 11. Two of the charges require specific mention, as they are the only convictions that Thomsen appeals: In Count 33, Thomsen was charged with

fraud and misuse of visas, permits, and other documents, in violation of 18 U.S.C. § 1546(a), arising from his use, on or about April 25, 2009, of a United States passport card bearing his photograph, but the name and biographical information of another person, on an application for an Earth Class Mail account; and, in Count 34, he was charged with aggravated identity theft, in violation of 18 U.S.C. § 1028A, during and in relation to the felony passport card fraud offense.[1]

Thomsen's trial began on November 29, 2011, and continued on December 2, 6, 7, and 8. The prosecution dismissed two mail fraud counts (Counts 5 and 6) before the case was submitted. The jury convicted Thomsen of the other 32 counts. Thomsen obtained permission to proceed *pro se*, thereafter, but with advisory counsel. On March 28, 2012, Thomsen filed a *pro se* Motion For Judgment Of Acquittal, as relevant here, on Counts 33 and 34. The court denied that motion on April 17, 2013.

---

[1] Thomsen was also charged with the following offenses: in Counts 1 through 6 of the Indictment with mail fraud, in violation of 18 U.S.C. § 1341, based on mailings in January and February of 2009 of preprinted refund checks or debit cards for refunds from two Electronic Return Originator (ERO) banks to Thomsen or his company; in Counts 7 through 16 with false, fictitious, and fraudulent claims, in violation of 18 U.S.C. § 287, based on the filing of fraudulent tax returns for 2008 in January and February 2009; in Counts 17 through 24 with fraudulent use of the social security numbers of other persons, in violation of 42 U.S.C. § 408(a)(8), based on the filing of several of the same tax returns for 2008 at issue in Counts 7 through 16, in January and February 2009; and in Counts 25 through 32 with aggravated identity theft, in violation of 18 U.S.C. § 1028A, again based on the filing of several of the same returns at issue in prior counts, in January and February 2009.

## B.  Charges And Disposition In The Second Case

On May 31, 2011, well before Thomsen's trial on the first Indictment, Thomsen and three co-defendants were charged in a separate Indictment, in a separate case, with conspiring, from a date unknown through about May 2011, to defraud the United States by obtaining, and aiding others to obtain, the payment of false, fictitious, and fraudulent claims against the United States, specifically, income tax refunds, in violation of 18 U.S.C. § 286 and 18 U.S.C. § 2.  The second Indictment alleged overt acts in furtherance of this conspiracy between December 30, 2009, and March 29, 2010.[2]  Thomsen's three co-defendants all eventually pleaded guilty to the fraudulent claims conspiracy charge in the second case and were sentenced to time served.  They were also ordered to pay restitution in the amount of $197,922.04, jointly and severally.  Thomsen neither pleaded guilty to nor was convicted on any of the charges against him in the second case.  The second indictment was eventually dismissed as to Thomsen after he was sentenced in the first case.

## C.  Sentencing

A Presentence Report (PSR) concerning Thomsen, filed July 20, 2012, indicates that the probation officer used the

---

[2] A Superseding Indictment in the second case, against Thomsen and one other defendant, added an overt act in furtherance of the original conspiracy on June 17, 2010; a new count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, from a date unknown through about June 2012; fourteen new counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A, based on the filing of tax returns for 2009 in January and February 2010; another six new counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A, also based on the filing of tax returns in January 2010; and forfeiture allegations.

November 1, 2011, Guidelines Manual. The PSR calculated an advisory guidelines range of 135 to 168 months of imprisonment, recommended a sentence approximately in the middle of that range, and recommended restitution in the amount of $317,337. At the first of three sentencing hearings, on March 4, 2013,[3] Thomsen recommended a sentence of not more than 5 years (60 months), and the prosecution recommended a sentence of 416 months. The prosecution stated its intent to increase the amount of restitution it was seeking, based on its desire to "roll that second case as relevant conduct into the first case," for a total of over $500,000 in restitution. Not surprisingly, Thomsen objected.

On April 17, 2013, the probation officer filed an Addendum To Presentence Report (Addendum), addressing the parties' objections to the original PSR. Neither the defendant nor the AUSA objected to the use of the 2011 Guideline Manual in the original PSR as the use of the wrong year of the Manual, nor did the probation officer recognize this crucial mistake. The Addendum did, however, recalculate Thomsen's advisory guidelines sentence. Those calculations are significant to Thomsen's appeal.

Specifically, for offenses in Group One (Counts 1–4, 7–16, and 17–24), the Addendum started with a base offense level of 7, pursuant to U.S.S.G. § 2B1.1(a)(1); added 14

---

[3] At the second sentencing hearing, on April 17, 2013, the district court allowed Thomsen two hours to cross-examine the government's witnesses on their declarations and documents supporting the intended losses claimed, although Thomsen contended he had only received some of the documentation the evening before. At the third sentencing hearing, on May 22, 2013, the court heard final arguments and imposed sentence.

levels for an intended loss between $400,000 and $1,000,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(H); added 6 levels for more than 250 victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(C); added 2 levels for "sophisticated means," pursuant to U.S.S.G. § 2B1.1(b)(10)(C); added 2 levels for using victims' social security numbers to produce other means of identification, identified as personal tax returns, pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i); added 2 levels for abuse of a position of trust, because Thomsen was a tax preparer to whom the personal information of others had been entrusted, and he used that information for his own financial gain, pursuant to U.S.S.G. § 3B1.3; and added 2 levels for obstruction of justice, based on false testimony at trial, pursuant to U.S.S.G. § 3C1.1. These calculations resulted in an adjusted offense level of 35 for Group One.

For the offense in Group Two (Count 33), the Addendum started with a base offense level of 7, pursuant to U.S.S.G. § 2L2.2(c)(1), using the cross-reference to U.S.S.G. § 2X1.1, because Thomsen used a passport or visa in the commission of a felony, with underlying substantive offenses of mail fraud, false claims, and fraudulent use of a social security card, making the corresponding offense level the one set out in U.S.S.G. § 2B1.1. The Addendum then made the identical adjustments to the offense level that it had made for the Group One offenses. These calculations, again, resulted in an adjusted offense level of 35.

The Addendum determined that the multiple count adjustment, pursuant to U.S.S.G. § 3D1.4, required an increase of two levels to 37. The Addendum then rejected any adjustment for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a). With a criminal history category of I, these calculations resulted in an advisory guidelines range of

210 to 262 months of imprisonment. The Addendum recommended a 72-month sentence (concurrent as to each count), however, based on the 18 U.S.C. § 3553(a) factors. The Addendum then applied a mandatory sentence of 2 years, consecutively, for each of Counts 25 through 32 and 34, which would have increased the sentence to 24 years (288 months). The Addendum recommended that the mandatory 2-year sentences on these counts run concurrently, however, which raised the recommended sentence to only 96 months (8 years).

At Thomsen's final sentencing hearing, the district judge heard arguments from the parties, then imposed sentence. More specifically, the district judge stated,

> First, I'm going to deal with the objection [sic]. There were various objections, lots of objections that were filed by Mr. Thomsen. I have a trial with a jury coming in in a short while, so I don't have really the time to go through all of them. I'm simply going to indicate that I have reviewed probation's response to those objections, and I adopt probation's views on every one of those objections. I think there was one exception. Let me double-check.

> Well, I note that there was an objection. I believe it was objection no. 16, which the court will grant.

The district judge concluded that some objections (nos. 17–19) would have no effect on the sentence that he would impose, then reiterated that he was "adopt[ing] probation's

findings and recommendations in connection" with the remaining objections.

Next, the district judge summarized and accepted the sentencing calculations in the Addendum; described the seriousness of the offense, and his reasons for rejecting both the prosecution's request for a sentence of 416 months and the probation officer's recommendation of 96 months; and explained his application of the § 3553(a) factors. Ultimately, the district judge imposed a sentence of 15 years (180 months). The district judge also ordered restitution in the amount of $515,257.75, with a credit of $61,545, and a remaining balance of $453,712.75 to be paid to the IRS, which included the loss in the second case against Thomsen and three co-defendants. The district judge expressly ordered "that the restitution in [the second case], in the amount of $197,922.04, be made payable jointly and severally with the other co-defendants in that case."

### D. Issues On Appeal

Thomsen filed timely notices of appeal. Thomsen's request to represent himself *pro se* on this appeal was denied, and his current counsel was appointed. Thomsen has limited his appeal to three issues: (1) the denial of his motion for judgment of acquittal as to Counts 33 and 34; (2) the restitution order; and (3) errors in sentencing, although this last issue has numerous subissues. In his brief, Thomsen states, "Aside from counts 33 and 34, he neither challenges his conviction nor seeks to have it set aside."

## II. LEGAL ANALYSIS

### A. Denial Of The Motion For Judgment Of Acquittal

Thomsen argues, first, that the district court should have granted his motion for judgment of acquittal as to Counts 33 and 34, which charged a violation of 18 U.S.C. § 1546 and a related aggravated identity theft offense, respectively. Thomsen contends that § 1546 does not apply to a passport card.

### 1. Applicable standards

We review *de novo* questions of statutory interpretation. *See, e.g.*, *Fang Lin Ai v. United States*, 809 F.3d 503, 506 (9th Cir. 2015); *United States v. Kowalczyk*, 805 F.3d 847, 856 (9th Cir. 2015). We recently stated,

> When interpreting a statute, we are guided by the fundamental canons of statutory construction and begin with the statutory text. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004). We interpret statutory terms in accordance with their ordinary meaning, unless the statute clearly expresses an intention to the contrary. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). We must "interpret [the] statut[e] as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous."

> *Boise Cascade Corp. v. U.S. E.P.A.*, 942 F.2d
> 1427, 1432 (9th Cir.1991). Additionally,
> "[p]articular phrases must be construed in
> light of the overall purpose and structure of
> the whole statutory scheme." *United States v.
> Lewis*, 67 F.3d 225, 228–29 (9th Cir.1995).

*United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015);
*accord United States v. Leal-Felix*, 665 F.3d 1037, 1042 (9th
Cir. 2011) ("Interpretation of a word or phrase [in a statute]
depends upon reading the whole statutory text, considering
the purpose and context of the statute, and consulting any
precedents or authorities that inform the analysis." (citation
and internal quotation marks omitted)). Notwithstanding the
importance of the text itself, we "must avoid a literal
interpretation of the statute that produces an 'absurd' result."
*United States v. Shill*, 740 F.3d 1347, 1353 (9th Cir. 2014)
(citing *United States v. American Trucking Ass'ns*, 310 U.S.
534, 543 (1940)); *United States v. Thompson*, 728 F.3d 1011,
1018 (9th Cir. 2013) (explaining that courts must not
"violate[] the precept that '[w]henever possible, "we interpret
statutes so as to preclude absurd results"'" (quoting *United
States v. Cabaccang*, 332 F.3d 622, 631 (9th Cir. 2003), with
citations omitted)).

Generally, we may turn to legislative history for guidance
only "[w]hen a statute is susceptible to two or more
meanings, . . . [b]ut 'the plainer the language, the more
convincing contrary legislative history must be.'" *Schroeder
v. United States*, 793 F.3d 1080, 1085 (9th Cir. 2015)
(quoting *Church of Scientology of Cal. v. U.S. Dep't of
Justice*, 612 F.2d 417, 422 (9th Cir. 1979)); *United States v.
Crooked Arm*, 788 F.3d 1065, 1073 (9th Cir. 2015) ("We may
consider legislative history if the statute is ambiguous or if

'the legislative history clearly indicates that Congress meant something other than what it said.'" (quoting *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (*en banc*), in turn quoting *Perlman v. Catapult Entm't, Inc.*, 165 F.3d 747, 753 (9th Cir. 1999)).    This limitation notwithstanding, we have also used legislative history to confirm an interpretation guided by other canons.  *See, e.g.*, *United States v. Hui Hsiung*, 778 F.3d 738, 754 (9th Cir. 2014) (noting, "The legislative history supports this statutory interpretation," based on other canons).

### 2.  *Analysis*

#### a.  **Krstic** *and* **Franklin**

The parties have framed the statutory interpretation issue in this case primarily in terms of whether we should follow *United States v. Krstic*, 558 F.3d 1010 (9th Cir. 2009), or *United States v. Franklin*, No. CR 07-967 PSG, 2011 WL 3424448 (C.D. Cal. Aug. 5, 2011), *aff'd*, 501 F. App'x 629 (9th Cir. 2012) (unpubl. mem.).  We conclude that *Krstic*, while relevant to some extent, is not controlling on the issues presented here; that our decision on appeal in *Franklin* is not controlling; and that we are not convinced by the district

court's interpretation of the statute in *Franklin.*[4]  Thus, we must embark on our own statutory interpretation.

Here, as in *Krstic*, we are presented with "a classic question of statutory interpretation," albeit a *different* one than we addressed in *Krstic*, and this question requires us to "begin . . . with the text of the statute."  558 F.3d at 1013.

### b.  Section 1546(a)

The text of § 1546(a) provides, in pertinent part, as follows:

---

[4] Nowhere in *Krstic* did we hold that the only documents covered by § 1546(a) are "immigrant or nonimmigrant" documents, as Thomsen contends.  Indeed, that question was not even before us, because the defendant in *Krstic* was an alien and the document in question was an alien registration card.  558 F.3d at 1012–13.  Furthermore, as we repeatedly made clear, the question in *Krstic* was not whether the statute applies only to "immigrant or nonimmigrant" documents, but whether "such" in the second clause of the statute referred to "immigrant or nonimmigrant" or "knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa."  *Id.* at 1013–17.

In *Franklin*, we affirmed a United States citizen's conviction pursuant to § 1546(a) for possession of a United States passport bearing his photograph, but the name and other identifying information of his cousin, knowing that the passport had been procured by means of a false claim and statement and by fraud and to have been unlawfully obtained, "for the reasons enumerated by the district court."  501 F. App'x at 630.  Our unpublished memorandum opinion in *Franklin* is not precedent.  *See* 9th Cir. R. 36-3.  The district court in *Franklin* applied several canons of statutory interpretation to reach its conclusion that a defendant could be convicted under § 1546(a) for possession of a U.S. passport, but we do not agree, for the reasons set out in the body of this opinion.

(a) *Whoever knowingly* forges, counterfeits, alters, or falsely makes any *immigrant or nonimmigrant* visa, permit, border crossing card, alien registration receipt card, or *other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States*, *or* utters, *uses*, attempts to use, possesses, obtains, accepts, or receives any *such* visa, permit, border crossing card, alien registration receipt card, or *other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States*, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained [shall be punished as specified.]

18 U.S.C. § 1546(a) (emphasis added). Thomsen's argument that the meaning of this statute is "plain" is belied by our observation in *Krstic* that, "with this section, Congress has achieved in a single 124-word sentence a level of confusion it usually takes pages to create." 558 F.3d at 1013. The confusion, here, involves the scope of the general or catchall "other document" clauses: Are the "other documents" limited to immigration-related documents, or can they include a U.S. passport or U.S. passport card?[5]

---

[5] Thomsen initially argued that a critical dispute in this appeal was whether a U.S. passport card *is* a passport, but the government conceded that it is. We agree. A "passport card," like a passport, is issued by the Department of State to United States citizens for travel abroad and reentry

### c.  Plain meaning

### i.  "Whoever . . ."

Although the statute is confusing, we are not without guidance.  First, we observe that § 1546(a) plainly and expressly applies to "whoever" engages in the proscribed conduct, not just to "any alien."  *Neal*, 776 F.3d at 652.  The government argues this means that the statute can apply to documents, such as U.S. passports, used by U.S. citizens, not just to documents used by aliens.  It is true that, some time ago, in *United States v. Knight*, 514 F.2d 1286 (5th Cir. 1975), the court rejected the argument that what is now the *third* paragraph of § 1546(a)[6] could not be violated by an American citizen.  514 F.2d at 1287.  In *Knight*, the court explained,

---

into the United States, albeit not for international air travel, but only when entering the United States from Canada, Mexico, the Caribbean, and Bermuda at land border crossings or sea ports-of-entry.  *See* 71 Fed. Reg. 60928-32, 2006 WL 2948176 (Oct. 17, 2006).

[6] Then, as now, the *third* paragraph of § 1546(a) provided, as follows:

> Whoever, when applying for an immigrant or nonimmigrant visa, permit, or other document required for entry into the United States, or for admission to the United States personates another, or falsely appears in the name of a deceased individual, or evades or attempts to evade the immigration laws by appearing under an assumed or fictitious name without disclosing his true identity, or sells or otherwise disposes of, or offers to sell or otherwise dispose of, or utters, such visa, permit, or other document, to any person not authorized by law to receive such document [shall be punished as provided].

> We agree with the district court, that the word "whoever" means exactly that. Though Knight is correct in his history, the section in question is no longer within Title 8, but is now in Title 18. *Cf.* 8 U.S.C.A., § 1325 on false or misleading representation by aliens which begins with the words "any alien".

*Id*.

The government's argument that "whoever" demonstrates that § 1546 applies to U.S. passports, because it applies to American citizens, goes too far.  Rather, we conclude that the use of "whoever" in § 1546(a) identifies only the status of the perpetrator, *not* the nature of the documents involved in the proscribed conduct.  For example, looking only to the plain text of § 1546(a), it is clear that a United States citizen could violate this provision by using an alien registration receipt card, which is an immigration-related document, knowing that it was forged to bear his or her name, perhaps to disguise his or her identity as a fugitive.  *See* 18 U.S.C. § 1546(a) (providing for the punishment of "whoever . . . uses . . . [an] alien registration receipt card . . . knowing it to be forged").  Thus, the fact that the statute applies prohibitions on the *conduct* of United States citizens does not mean that the documents to which it applies necessarily include documents that are not immigration-related, such as U.S. passports issued to U.S. citizens.

### ii.   *"Immigrant and nonimmigrant . . ."*

Continuing our examination of the plain text of the statute, we note that the words "immigrant and nonimmigrant" precede the list of documents to which

§ 1546(a) applies. If "immigrant and nonimmigrant" modify *all* of the listed documents, then the scope of the statute would seem to be restricted to immigration-related documents. We agree with the district court in *Franklin* that the plain text of § 1546(a) does not preclude a reading of the adjectives "immigrant and nonimmigrant" as modifying *all* of the listed documents. 2011 WL 3424448 at *5. Under that reading, the provision would only apply to documents that are immigration-related. *Id.*

That is not the end of the inquiry, however. Rather, reading the whole statutory text, considering its purpose and context, *see Leal-Felix*, 665 F.3d at 1042, and, most importantly, "avoid[ing] a literal interpretation of the statute that produces an 'absurd' result," *Shill*, 740 F.3d at 1353; *Thompson*, 728 F.3d at 1018, we conclude that "immigrant and nonimmigrant" *cannot* be read to apply to all of the listed documents. As the United States points out, a "nonimmigrant alien registration receipt card" does not exist, and 8 U.S.C. § 1101(a)(6) defines "border crossing identification card," not an "immigrant border crossing identification card" or a "nonimmigrant border crossing identification card." Furthermore, "immigrant visa" and "nonimmigrant visa" are defined in the 1952 legislation that also amended § 1546(a) to include "immigrant and nonimmigrant" immediately before "visa," 66 Stat. 163, 169, 275 (1952), *codified at* 8 U.S.C. § 1101(a)(16).[7] Thus, a plain reading of the text, in light of the overall purpose and structure of the *whole* statutory scheme, *Neal*, 776 F.3d at 652; *Leal-Felix*, 665 F.3d

---

[7] The words "immigrant" and "nonimmigrant" describe different classes of aliens, not United States citizens. 8 U.S.C. § 1101(a)(15).

at 1042, is that "immigrant and nonimmigrant," as used in § 1546(a), modify only "visa."[8]

As we explain, below, the government goes too far, however, when it argues that, because "immigrant and nonimmigrant" modify only "visa," the "other document[s]" to which § 1546(a) applies are not just immigration-related documents, but include U.S. passports.

### iii. Omission of "passport" from the list

Looking further at the plain text of the statute, *see Neal*, 776 F.3d at 652, we find that the words "passport" and "passport card" are conspicuous by their absence from § 1546(a). Congress could easily have included "passport" in the list in § 1546, if it had intended § 1546 to apply to "passports." Indeed, § 1546(a) is the only statute in the group of statutes (18 U.S.C. §§ 1541–1547) relating to "passports and visas" that does *not* contain the word "passport." This omission from the statute's plain text—which we must consider intentional—suggests that "passports" do not fall within the scope of the statute. In contrast, § 1543 *explicitly*

---

[8] In other words, reference to the legislative history—here, the 1952 act amending § 1546(a)—would have eliminated any ambiguity about whether "immigrant and nonimmigrant" were intended to modify more than "visa"—they were not. *See Schroeder*, 793 F.3d at 1085. At the very least, this legislative history would have confirmed a plain reading of "immigrant and nonimmigrant" as modifying only "visa." *Hui Hsiung*, 778 F.3d at 754.

prohibits some of the same kinds of conduct involving "passports" that § 1546 prohibits as to the listed documents.[9]

It is true, as the government argues, that the prosecution has the discretion to decide what charge to file when more than one statute prohibits the conduct in question. *United States v. Batchelder*, 442 U.S. 114, 123–24 (1979) ("This Court has long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants."); *accord United States v. Maes*, 546 F.3d 1066, 1068 (9th Cir. 2008). That argument strikes

---

[9] Section 1543 provides as follows:

> Whoever falsely makes, forges, counterfeits, mutilates, or alters any passport or instrument purporting to be a passport, with intent that the same may be used; or

> Whoever willfully and knowingly *uses, or attempts to use, or furnishes* to another for use any such false, forged, counterfeited, mutilated, or altered passport or instrument purporting to be a passport, or any passport validly issued which has become void by the occurrence of any condition therein prescribed invalidating the same [shall be punished as provided].

18 U.S.C. § 1543 (emphasis added). Section 1546(a) applies to one who "utters, . . . possesses, obtains, accepts, or receives" an identified document, which § 1543 does not. Section 1543 applies to "furnish[ing]" a document identified, but § 1546(a) does not. We need not decide whether "furnishing" and "uttering" proscribe similar or equivalent conduct; we simply note the differences in the terms used. Here, Thomsen was charged in Count 33 with "knowingly us[ing], possess[ing] and utter[ing]" a document to which § 1546(a) applies. Thus, in Thomsen's case, the two statutes would overlap as to the "us[ing]" of a passport, if both apply to passports.

us as beside the point, however, in the context of a group of *related* statutes, where it would be particularly odd to construe two provisions to state duplicate prohibitions on some of the same conduct involving some of the same documents.

Rather, in this context, the difference in language between the provisions strongly suggests that the purpose of the two statutes was to address *different* kinds of documents, "passports" in § 1543 and immigration-related documents in § 1546. *See White v. Lambert*, 370 F.3d 1002, 1011 (9th Cir. 2004) ("It is axiomatic that when Congress uses different text in 'adjacent' statutes it intends that the different terms carry a different meaning."), *overruled on other grounds by Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc); *Crawford v. Burke*, 195 U.S. 176, 190 (1904) (explaining that "a change in phraseology creates a presumption of a change in intent" and that "Congress would not have used such different language [in two statutes] without thereby intending a change of meaning").  In other words, the omission of "passports" from § 1546(a) and the use of different terms in that provision than are found in related, adjacent provisions lead us back to the conclusion that § 1546(a) does not apply to U.S. passports.  Other canons of interpretation confirm this conclusion.

### d.  *Other canons of interpretation*

### i.  **Ejusdem generis**

As the Supreme Court has explained,

> [The] canon . . . *ejusdem generis* counsels: "Where general words follow specific words

> in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Washington State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003) (internal quotation marks omitted).

*Yates v. United States*, ___ U.S. ___, ___, 135 S. Ct. 1074, 1086 (2015).[10] In *Franklin*, on which the government relies, the district court applied the canon *ejusdem generis* to conclude that "it [is] logical, but not necessary, to conclude that the general 'other document' term [in § 1546(a)] should not be read broadly to include plane tickets (which might assist in physically 'entering' the country), but should instead be limited to immigration documents of the type that an *alien* might use to validly enter, stay and work in the United States." 2011 WL 3424448 at *5 (emphasis in the original). We agree.

The government's argument that § 1546(a) applies to more than immigration-related documents might be more persuasive if § 1546(a) referred simply to "document[s]," rather than to "other documents," that are "prescribed by statute or regulation for entry into or as evidence of

---

[10] Applying this canon in *Yates*, the Supreme Court concluded, "Had Congress intended 'tangible object' in § 1519 to be interpreted so generically as to capture physical objects as dissimilar as documents and fish, Congress would have had no reason to refer specifically to 'record' or 'document.' The Government's unbounded reading of 'tangible object' would render those words misleading surplusage." ___ U.S. at ___, 135 S. Ct. at 1087.

authorized stay or employment in the United States." Here, the use of "other" plainly suggests that the "document[s]" are documents *like the ones preceding them in the list*, that is, immigration-related documents. *Yates*, ___ U.S. at ___. 135 S. Ct. at 1086.

Although the district court in *Franklin* found reasons *not* to settle on the interpretation suggested by application of *ejusdem generis*, we do, in light of still other canons of interpretation.

### ii. *Interpretation in the context of its* **corpus juris**

The district court in *Franklin* applied the principle that courts must not interpret a statute in isolation, but must consider "the context of the *corpus juris* of which they are a part." *Franklin*, 2011 WL 3424448 at *5 (quoting *Branch v. Smith*, 538 U.S. 254, 281 (2003)); *accord Leal-Felix*, 665 F.3d at 1042. We agree that resort to this principle is also appropriate, but we disagree with the interpretation based on this principle reached by the district court in *Franklin*.

The district court in *Franklin* concluded that the principle of considering the statute's context required "reference to other aspects of the Immigration Reform and Control Act of 1986 (the 'IRCA')." *Franklin*, 2011 WL 3424448 at *5. Again, we agree. The district court in *Franklin* then reasoned, as follows:

> Under IRCA § 101, 8 U.S.C. § 1324a, a United States passport is "prescribed by statute" as "evidence of authorized ... employment." 8 U.S.C. § 1324a(b)(1)(B)(i). Under IRCA's implementing regulations,

a United States passport is also "prescribed by ... regulation" as "evidence of authorized ... employment." 8 C.F.R. § 274a.2(b)(1)(v)(A)(1). Thus, after giving context to 18 U.S.C. § 1546(a) by examining the IRCA's relevant provisions, and after considering other cases addressing similar questions, the Court concludes that a United States passport is within § 1546(a)'s reach as an "other document prescribed by [both] statute [and] regulation ... as evidence of authorized ... employment." Though the Court superficially agrees with Franklin that § 1546(a) appears to apply only to alien-related documents, no cannon [sic] of statutory construction can undo what Congress clearly did in the IRCA. For if courts are instructed to look to IRCA § 101 to determine the scope of § 1546, as so held by the Eighth and Ninth Circuits, then Congress has specifically spoken as to the types of "other documents" covered by § 1546 and the analysis stops with the text of the law.

*Franklin*, 2011 WL 3424448 at *7 (footnote omitted). It is here that we believe the district court in *Franklin* went astray.

Even though "passports" are documents prescribed by § 1324a(b)(1)(B)(i) as evidence of authorized employment in the United States, it does not necessarily follow that § 1546(a) applies to passports. We note that immigration-related documents are also prescribed by § 1324a(b)(1) as establishing both employment authorization and identity, specifically, a "resident alien card, alien registration

card"—which are listed in § 1546(a)—"or *other document* designated by the Attorney General" meeting certain requirements. 8 U.S.C. § 1324(b)(1)(B)(ii) (emphasis added). Immigration-related documents are also found among "*other documentation* evidencing authorization of employment in the United States which the Attorney General finds, by regulation, to be acceptable for purposes of this section." 8 U.S.C. § 1324a(b)(1)(C)(ii) (emphasis added); *see, e.g.*, 8 C.F.R. § 274a.12.

In short, where the canon *ejusdem generis* leads to the conclusion that the general "other documents" clause is limited to immigration-related documents, the relevant context of the *corpus juris* of which § 1546(a) is a part includes the provisions of § 1324a(1)(b) *referring to immigration-related documents*. Furthermore, to the extent that § 1546 echoes, not merely references, language from § 1324a(b)(1), it echoes the provisions specifically describing immigration-related documents, 8 U.S.C. § 1324a(b)(1)(B)(ii) and 8 U.S.C. § 1324a(b)(1)(C)(ii), *not* the provision identifying "passports," 8 U.S.C. § 1324a(b)(1)(B)(i). Reference to the IRCA does not require an interpretation of § 1546(a) as applying to U.S. passports.

### e.  Summary

We hold that § 1546(a) does not apply to U.S. passports or U.S. passport cards. Thus, the district court erred by denying Thomsen's motion for judgment of acquittal as to Counts 33 and 34.[11]

---

[11] Therefore, we do not reach Thomsen's argument that the rule of lenity applies. "The rule of lenity. . . applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous

## B.  Restitution

Thomsen next contends that the district court improperly included amounts from the dismissed case and made other errors in determining the amount of restitution.  This issue has both legal and factual aspects.

### 1.  Standard of review

We have explained,

> We review a restitution order for "an abuse of discretion, provided that it is within the bounds of the statutory framework." *United States v. Gordon*, 393 F.3d 1044, 1051 (9th Cir.2004) (internal quotation marks omitted). "Factual findings supporting an order of restitution are reviewed for clear error. The legality of [the] order is reviewed de novo."

---

statute."  *United States v. Shabani*, 513 U.S. 10, 17 (1994); *Krstic*, 558 F.3d at 1017 n.9.  Here, the analysis, above, shows that we are not left with an ambiguous statute, after correct application of the pertinent canons of statutory construction.  We acknowledge, however, that perhaps ambiguity, like plain meaning and beauty, "is sometimes in the eye of the beholder."  *Florida Power & Light Co. v. United States Nuclear Regulatory Comm'n*, 470 U.S. 729, 737 (1985) ("Yet plain meaning, like beauty, is sometimes in the eye of the beholder."); *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 572 (2005) (Stevens, J., joined by Breyer, J., dissenting) ("Because ambiguity is apparently in the eye of the beholder, I remain convinced that it is unwise to treat the ambiguity *vel non* of a statute as determinative of whether legislative history is consulted.").  Any holding that the statute is ambiguous as to its application to U.S. passports or U.S. passport cards would invoke the rule of lenity and, likewise, require Thomsen's acquittal of Counts 33 and 34.

*Id.* (internal quotation marks and ellipsis omitted).

*United States v. Inouye*, ___ F.3d ___, ___, 2016 WL 2641109, at *2 (9th Cir. May 10, 2016). Thus, the proper scope of the conduct on which restitution can be based is a legal question; what conduct by Thomsen falls within that scope is a question of fact.

### 2. Legality of the restitution order

### a. Applicable standards

As to the legal question, it was once the case that a defendant could be required to pay restitution only to the victims of the offenses of which he was convicted, as Thomsen now argues. *See Hughey v. United States*, 495 U.S. 411, 422 (1990) ("Petitioner pleaded guilty only to the charge that he fraudulently used the credit card of Hershey Godfrey. Because the restitution order encompassed losses stemming from alleged fraudulent uses of cards issued to persons other than Godfrey, such portions of the order are invalid."). Subsequently, however,

> The portion of *Hughey* that limited restitution to those losses caused by the actual offense of conviction was abrogated by the 1990 amendments to section 3663. Section 3663 now provides that if the offense of conviction involves a scheme, conspiracy, or pattern of conduct, restitution may include all losses caused during the course of that scheme, conspiracy or pattern. *See* 18 U.S.C. § 3663(a)(2) (Supp. V 1999). The *Hughey*

rule still applies, however, where the defendant has not been convicted of an offense having a conspiracy, scheme or pattern of conduct as an element. *United States v. Lawrence*, 189 F.3d 838, 846 (9th Cir.1999). In addition, even under section 3663(a)(2)'s current expanded definition, a victim must be "directly harmed by the defendant's criminal conduct." 18 U.S.C. § 3663(a)(2) (Supp. V 1999).

*United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 927 n.10 (9th Cir. 2001); *accord United States v. Brock-Davis*, 504 F.3d 991, 998–99 (9th Cir. 2007) (also recognizing the amendments abrogating *Hughey* also abrogated circuit case law that restitution must be limited to the loss attributable to the specific conduct underlying the conviction).[12]

---

[12] Section 3663(a)(2) provides, in pertinent part, as follows:

(2) For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, *in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern*.

18 U.S.C. § 3663(a)(2) (emphasis added). The pertinent parts of § 3663(a)(2) and § 3663A(a)(2), the statute applicable here, are identical, as will be seen from the quotation of the latter statute in the body.

We have explained,

> The Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, requires a district court to "order a defendant to make restitution to a victim of certain specified offenses." *United States v. Anderson*, 741 F.3d 938, 951 (9th Cir.2013) (citation omitted). The amount of restitution is limited to the victim's "actual losses" that are a direct and proximate result of the defendant's offense. *United States v. Hunter*, 618 F.3d 1062, 1064 (9th Cir.2010).

*United States v. Eyraud*, 809 F.3d 462, 467 (9th Cir. 2015). Restitution is mandatory, pursuant to § 3663A(a)(1) for "an offense described in subsection (c)," which includes "an offense against property under this title, . . . including any offense committed by fraud or deceit."  18 U.S.C. § 3663A(c)(1)(A)(ii).

Restitution is mandatory in this case, because we have recognized that § 3663A(c)(1)(A)(ii) applies to mail fraud, as prohibited by 18 U.S.C. § 1341, *United States v. Grice*, 319 F.3d 1174, 1177 (9th Cir. 2003), and Thomsen was convicted of several mail fraud offenses (Counts 1 through 4). Similarly, other courts have held that, because they are offenses under Title 18, convictions on charges of false claims for tax refunds, in violation of 18 U.S.C. § 287, like Thomsen's convictions on Counts 7 through 16, and convictions on charges of identity theft, in violation of 18 U.S.C. § 1028A, like Thomsen's convictions on Counts 25 through 32 and 34, also fall under § 3663A(c)(1)(A)(ii). *See United States v. Cohan*, 798 F.3d 84, 89 (2d Cir. 2015)

(§ 1028A); *United States v. Blanchard*, 616 F.3d 562, 577 (6th Cir. 2010) (§ 287).

Under the mandatory restitution provision,

> (2) For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, *in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.*

18 U.S.C. § 3663A(a)(2) (emphasis added). For a fraud offense, the district court is required to order restitution in the amount of the victim's actual loss. 18 U.S.C. §§ 3663A(c)(1)(A)(ii), 3664(f)(1)(A).

More specifically, in the case of a conviction for a crime or crimes that require proof of a "scheme, conspiracy, or pattern of criminal activity," such as mail fraud,[13]

---

[13] The elements of mail fraud are the following: "(1) proof of a scheme to defraud, (2) using the mails . . . to further the fraudulent scheme, and (3) specific intent to defraud." *United States v. French*, 748 F.3d 922, 935 (9th Cir. 2014) (citing 18 U.S.C. § 1341). The other Title 18 offenses of which Thomsen was convicted do not have a "scheme, pattern, or conspiracy" element. *See, e.g.*, *United States v. Atalig*, 502 F.3d 1063, 1067 (9th Cir. 2007) (elements of false claims under § 287); *United States v. Osuna-Alvarez*, 788 F.3d 1183, 1185 (9th Cir. 2015) (elements of aggravated identity theft under § 1028A). In a conspiracy case, restitution may be ordered against each defendant to the extent that the victim's

restitution may be ordered for all persons directly harmed by the entire scheme. *Such restitution is not limited to harm caused by the particular counts of conviction (as it would be absent the scheme element). See United States v. Booth*, 309 F.3d 566, 575–76 (9th Cir.2002). In this context, *a restitution order may be based on related but uncharged conduct that is part of a fraud scheme. See United States v. Grice*, 319 F.3d 1174, 1177 (9th Cir.2003) (affirming restitution of loss from uncharged conduct beginning prior to the effective date of the MVRA). *The harm to the victim must, however, be closely related to the scheme, rather than tangentially linked. United States v. Riley*, 143 F.3d 1289, 1292 (9th Cir.1998) (quoting *United States v. Kones*, 77 F.3d 66, 70 (3rd Cir.1996)); *see also [United States v.] Gamma Tech Indus.*, 265 F.3d [917,] 928 [(9th Cir. 2001)] ("the loss cannot be too far removed from" the "conduct underlying the offense of conviction").

*In re Her Majesty the Queen in Right of Canada*, 785 F.3d 1273, 1276 (9th Cir. 2015) (emphasis added). "In other words, 'when the crime of conviction includes a scheme, conspiracy, or pattern of criminal activity as an element of the

---

losses were reasonably foreseeable to that defendant. *United States v. Riley*, 335 F.3d 919, 932 (9th Cir. 2003). Thomsen was not charged with or convicted of a conspiracy offense in the first case, however. Although a conspiracy offense was charged in the second case, Thomsen was not convicted of any offenses in the second case.

offense, . . . the restitution order [may] *include acts of related conduct for which the defendant was not convicted.*'" *Brock-Davis*, 504 F.3d at 999 (quoting *United States v. Lawrence*, 189 F.3d 838, 846–47 (9th Cir. 1997), with emphasis added); *accord Grice*, 319 F.3d at 1178 ("[P]ermitting restitution under the MVRA *for related, but uncharged mail fraud conduct* occurring prior to and continuing past the MVRA's enactment is consistent with the text of the statute and related authority." (emphasis added)).

### b. Analysis

Here, the district court did not err, as a matter of law, in concluding that awarding restitution for related conduct beyond the conduct for which Thomsen was specifically convicted was within statutory bounds. *Inouye*, ___ F.3d at ___, 2016 WL 2641109 at *2. This is so, because (1) Thomsen was convicted of mail fraud offenses, which required proof of a "scheme" element, *see French*, 748 F.3d at 935, and (2) pursuant to § 3663A(a)(2), restitution for such offenses is not limited to harm caused by the particular counts of conviction, but may be based on related, uncharged conduct that is part of a fraud scheme, *see In re Her Majesty*, 785 F.3d at 1276; *Brock-Davis*, 504 F.3d at 999; *Grice*, 319 F.3d at 1178.

### 3. The disputed factual question

### a. Applicable standards

The disputed factual question, here, is whether the district court properly found that all of the losses alleged by the United States as the basis for restitution, including losses from conduct charged only in the second case, were losses

from "related conduct." *See In re Her Majesty*, 785 F.3d at 1276.[14] "[T]he government [must] prove[] the amount of loss and causation by a preponderance of the evidence." *Eyraud*, 809 F.3d at 467. Thomsen's challenge to those factual findings stands on much firmer ground than his challenge to the legal scope of restitution.

To prove the necessary close relationship to the scheme of conviction, it is not enough to show another fraud against the victim that had "aspects in common with the scheme" of conviction, or even to show that both frauds were "built upon the same central falsity." *In re Her Majesty*, 785 F.3d at 1276. Rather, there must be a "causal" link between the two, and that link may be lacking where the fraud against the victim and the fraud scheme of conviction "were accomplished by different means, had different victims, and took place primarily in different [locations]." *Id.* at 1276–77. To put it another way, the fraud against the victim must not be "linked too tangentially to be part of the same 'scheme, conspiracy, or pattern of criminal activity.'" *Id.* at 1277 (quoting § 3663A(a)(2)).

Applying these standards, we rejected Canada's restitution claim based on the biofuel subsidy fraud committed by the owners of a Canadian plant, while awarding

---

[14] The key question is not whether the United States proved that various amounts of loss were caused by Thomsen's conduct, including his conduct in the second case, as the United States would have it. One might agree with the United States and the district court that the United States proved by a preponderance of the evidence, or even beyond a reasonable doubt, that all of the losses at issue were caused by Thomsen's conduct charged in either the first or the second case. The question of the adequacy of proof of particular losses, however, is only relevant if those losses arose from conduct sufficiently closely "related" to the scheme of conviction.

restitution to the United States for fraudulent use of biodiesel credits, explaining the schemes were parallel, but different:

> The schemes [one involving Canada and one leading to conviction], however, were different. The indictment charged, and the facts supporting the guilty plea described, a scheme revolving around the false generation and use of United States biodiesel credits known as renewable identification numbers ("RINs"). It appears that the RIN fraud in the United States and the biofuel subsidy fraud in Canada proceeded on parallel tracks. But they were not causally linked. The record does not reflect that either country considered the other's renewable energy program in calculating its own incentives. The schemes were accomplished by different means, had different victims, and took place primarily in different countries. They were linked too tangentially to be part of the same "scheme, conspiracy, or pattern of criminal activity." 18 U.S.C. § 3663A(a)(2).

*In re Her Majesty*, 785 F.3d at 1276–77 (footnote omitted).

In contrast, the necessary "relatedness" was shown in *Brock-Davis*, which involved a conviction for conspiracy to manufacture methamphetamine in Missoula, Montana. 504 F.3d at 998. The defendant challenged the award of restitution for damage to and clean up of a motel room in Kalispell, Montana, even though there was, at least arguably, no proven methamphetamine manufacturing in that motel room, and nothing in the indictment or the plea hearing

mentioned Kalispell, that motel, or its owner. *Id.* We explained why the loss for the Kalispell motel room was sufficiently "related" to the conspiracy of conviction to permit a restitution award, as follows:

> Even were the law of restitution not more expansive for convictions for conspiracy than for other crimes, the district court would not have committed clear error in finding that the same conspiracy was at issue in Missoula and Kalispell. The evidence disclosed the existence of two partial meth labs (in the first hotel room [in Missoula] and in Room 107 [of the Kalispell motel]) being created by Brock-Davis and Willingham *at the same time*—with one room containing the microwave and the other containing the microwave box—and items in the trunk of the car in which Brock-Davis and Willingham were apprehended that would have supplemented either lab (or even have constituted the lab itself) at the motels Brock-Davis and Willingham chose. In addition, Willingham pointed the police to the Aero Inn in Kalispell after his arrest, and Brock-Davis had checked into that room—which contained evidence consistent with the existence of a meth lab, as even [a] defense witness . . . acknowledged.

*Brock-Davis*, 504 F.3d at 999 (emphasis added).

Similarly, in *Grice*, which involved mail fraud convictions, we held that losses from before the date of the defendant's first mail fraud offense were properly included in

the restitution order. 319 F.3d at 1178. In *Grice*, the defendant directed delivery to herself of dividend checks payable to her son by filing change-of-address forms, and she cashed those checks even after her son's eighteenth birthday when she was no longer entitled to do so. *Id.* at 1176, 1178. Her first mail fraud offense, however, was four years after her son turned eighteen, and she argued that, prior to that, the checks just kept coming to her after it became illegal to cash them, so they were not part of the mail fraud scheme. *Id.* at 1178. We disagreed:

> The checks Grice cashed illegally were delivered to her address solely because of the eleven change of address forms she filed prior to William's eighteenth birthday. Her *modus operandi* was identical throughout the entire period of the scheme she devised. When CIRI sent William a letter informing William of his adult status in the corporation, Grice failed to inform CIRI that William was not living at her address. Grice knew CIRI would continue to send William's checks to her address where she could forge and cash them, knowing it was illegal to do so. By filing eleven change of address forms and then failing to inform CIRI that William no longer lived at her address, Grice "made use of or caused the use of the mails" in furtherance of her scheme. *[United States v.] Lo*, 231 F.3d [471,] 475 [(9th Cir. 2000)]. Accordingly, we conclude that Grice's scheme extended back to October

> 1988 and the district court properly included the disputed $7,535.07 in its restitution order.

*Grice*, 504 F.3d at 1178–79.

### b.  *Analysis*

Here, as Thomsen points out, the United States repeatedly refers to his "multi-year fraudulent scheme" in its brief, but nowhere identifies *evidence* establishing—or identified by the district court as the basis for a finding—that the scheme charged in the second case, in which Thomsen was not convicted, was, in fact, the same scheme as, or was related to, the scheme charged in the first case, in which Thomsen was convicted.  At most, the United States has shown that both schemes were designed to obtain tax refunds by fraud and that Thomsen was involved in both of them.  That is not enough.  *See In re Her Majesty*, 785 F.3d at 1276 (sufficient "relatedness" is not shown simply from the fact that the claimed loss had "aspects in common with the scheme" of conviction, or even that both had been "built upon the same central falsity").  As in *In re Her Majesty*, the losses in the first and second cases against Thomsen "were accomplished by different means, had different victims, and took place primarily in different [locations]," *id.* at 1276–77; *and cf. Grice*, 504 F.3d at 1178–79 (finding that the fraud for which restitution was sought was conducted by the same *modus operandi*), and, here, also during different time frames, *cf. Brock-Davis*, 504 F.3d at 999 (conduct not mentioned in the indictment was related, for purposes of restitution, because it was not only of the same kind and involved the same participants, but was at the same time).

Specifically, the frauds in the first case against Thomsen were accomplished by Thomsen himself, acting alone, apparently all in California, using the mails, while the frauds charged in the second case involved different victims, were accomplished by wire fraud, and involved at least three other co-defendants working in multiple states. As originally charged, the second case did not involve *any* of the same offenses as those charged in the first case. There is undeniably some relationship between a § 286 offense of conspiracy to obtain payment of false claims, as charged in the second case, and the substantive § 287 offense of actually making a false claim, as charged in the first case. Nevertheless, the difference between a conspiracy, involving multiple co-defendants to accomplish the fraud, and a substantive offense, involving a single person from start to finish, actually highlights the difference in the *modus operandi* of the false claim offenses in the two cases. *Cf. Grice*, 504 F.3d at 1178–79 (noting the use of an identical *modus operandi* to commit the offenses for which restitution was sought and the offense of conviction). The allegation that the conspiracies in the second case began on "unknown" dates does nothing to tie the earlier and later offenses together in the absence of any *evidence* of actual temporal overlap. *Cf. Brock-Davis*, 504 F.3d at 999 (conduct not mentioned in the indictment was related, for purposes of restitution, because it was shown by the evidence to be at the same time).[15]

---

[15] The government's contention that tax fraud is necessarily seasonal or cyclical does not convince us that the lack of temporal overlap should be ignored, especially where the personnel (other than Thomsen) and the *modus operandi* involved did not overlap.

The addition of charges of aggravated identity theft, in violation of 18 U.S.C. § 1028A, in the Superseding Indictment in the second case, based on filing of tax returns, which are similar to such charges in the first case, does not create sufficient "linkage" between the earlier and later conduct. Section 1028A offenses do not involve proof of a "scheme" as an element, so that restitution based on those offenses would be appropriate only for conduct resulting in convictions. *See Gamma Tech Indus., Inc.*, 265 F.3d at 927 n.10. Finally, the time frame and the dates of the overt acts in furtherance of the original conspiracy charged in the second case (and, indeed, the overt acts in furtherance of the additional wire fraud conspiracy added later) do not involve any temporal overlap at all with the dates of the offenses charged in the first case. *Compare Brock-Davis*, 504 F.3d at 999 (conduct not mentioned in the indictment was related, for purposes of restitution, because it was not only of the same kind and involved the same participants, but was at the same time).

In short, the district court clearly erred in holding that the conduct at issue in the second case was sufficiently "related" to the conduct at issue in the first case to warrant inclusion of losses in the second case in the order for restitution pursuant to 18 U.S.C. § 3663A(a)(2). *See Inouye*, ___ F.3d at ___, 2016 WL 2641109 at *2 (factual findings for restitution are reviewed for clear error). Consequently, although ordering restitution for related conduct that did not result in a conviction was within "statutory bounds," the order for restitution, here, was an abuse of discretion. *Id.*[16]

---

[16] In briefing on the asserted sentencing errors, Thomsen challenges the inclusion of certain amounts in the restitution order, as without evidentiary basis, including amounts that were shown to be related to the scheme of

## C. Sentencing Errors

Thomsen argues the district court erred in calculating Thomsen's advisory guidelines sentence. He asserts the following alleged sentencing errors: (1) use of the wrong Guidelines Manual; (2) miscalculation of the "intended loss"; (3) misapplication of the "identity theft" enhancement; (4) misapplication of the "sophisticated means" enhancement; (5) misapplication of the U.S.S.G. § 2L2.2(c)(1)(A) cross-reference to U.S.S.G. § 2X1.1; (6) misapplication of the "abuse of trust" enhancement; and (7) misapplication of the "obstruction of justice" enhancement.[17]

### 1. Applicable standards

"The district court must correctly calculate the recommended Guidelines sentence" before sentencing a defendant. *United States v. Hymas*, 780 F.3d 1285, 1292 (9th Cir. 2015) (brackets and citation omitted); *accord United States v. Bernardo*, 818 F.3d 983, 985 (9th Cir. 2016) ("'Even though the Guidelines are advisory, they are still the "starting

---

conviction in the first case. We will consider those challenges in the next section.

[17] We note the Addendum did little to assist the trial court in determining the merits of the parties' objections. Rather than discussing and offering reasoned resolutions to the numerous objections, the Addendum did little more than repeatedly invoke the mantra, "The undersigned stands by [his original determination]." As to one of Thomsen's critical guidelines disputes, concerning the amount of restitution, the Addendum claims that "[t]hese objections have been addressed in the undersigned's response to the government's guideline disputes." This response is unhelpful, because the probation officer's response to the pertinent guideline dispute by the government is that "the overall matter of relevant conduct is deferred to the Court for resolution." *See* Addendum at 6, ¶ 3 & 6.

point and the initial benchmark" for the sentencing process.'" (quoting *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011), in turn quoting *Kimbrough v. United States*, 552 U.S. 85, 108 (2007)). More specifically, "we 'must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range.'" *Bernardo*, 818 F.3d at 985 (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)); *United States v. Johnson*, 812 F.3d 757, 761 (9th Cir. 2016) (adding to the list of procedural errors "'treating the Guidelines as mandatory, failing to properly consider the [18 U.S.C.] § 3553(a) factors, using clearly erroneous facts when calculating the Guidelines range or determining the sentence, and failing to provide an adequate explanation for the sentence imposed'" (quoting *United States v. Christensen*, 732 F.3d 1094, 1100 (9th Cir. 2013)). In doing so,

> [w]e review the district court's factual findings for clear error and its interpretation of the Sentencing Guidelines de novo. *United States v. Smith*, 719 F.3d 1120, 1123 (9th Cir.2013). There is a longstanding intracircuit conflict as to whether we review the district court's application of the guidelines to the facts de novo or for abuse of discretion, *United States v. Sullivan*, 797 F.3d 623, 641 n. 13 (9th Cir.2015), but [if] we would reach the same conclusion here under either standard, we need not call this case en banc to resolve the conflict.

*Bernardo*, 818 F.3d at 985.

## 2.  Alleged errors

### a.  The wrong Guidelines Manual

Thomsen challenges the calculation of the number of victims under U.S.S.G. § 2B1.1(b)(2)(C) from the 2011 Guidelines Manual.  He argues that version of the guideline was first included in the 2009 Guidelines Manual, effective November 1, 2009.  Thus, he argues, it was not in effect at the time of the offenses for which he was convicted, causing an *ex post facto* violation.  He argues that the only proper "victim" is the IRS under the correct, 2008, version of the guidelines.  The United States concedes that the wrong version of U.S.S.G. § 2B1.1(b)(2)(C) was used and that this error requires remand to resolve the determination of the number of victims.  We agree.

A district court properly applies the version of the Sentencing Guidelines in effect at the time of sentencing, unless doing so would violate the *ex post facto* clause. U.S.S.G. §§ 1B1.11(a), (b)(1).  "To implicate ex post facto concerns, amendments to the Sentencing Guidelines must present 'a sufficient risk of *increasing* the measure of punishment attached to the covered crimes.'"  *United States v. Waters*, 771 F.3d 679, 680 (9th Cir. 2014) (quoting *Peugh v. United States*, ___ U.S. ___, ___, 133 S. Ct. 2072, 2082 (2013)).  There is little doubt that use of the "wrong" version of U.S.S.G. § 2B1.1(b)(2) in this case resulted in "'a sufficient risk of increasing the measure of punishment'" for Thomsen's convictions to raise an *ex post facto* problem.  *Id.* (quoting *Peugh*, ___ U.S. at ___, 133 S. Ct. at 2082).  Here, the "wrong" version of the applicable guideline increased Thomsen's advisory guidelines range by six levels; the United States does not argue that it is clear that the district

court would have applied the same sentence under the older guideline, but rather concedes that remand is appropriate; and the only other Circuit Court of Appeals to consider whether the amendment of this guideline violated the *ex post facto* clause under the *Peugh* standard also reversed for resentencing. *See United States v. Diaz*, 515 F. App'x 595, 595–96 (7th Cir. 2013) (unpubl. mem.).

Upon remand, the district court must correct the *ex post facto* violation. Moreover, the commentary to § 1B1.11 provides that "if an earlier edition of the Guidelines Manual is used, it is to be used in its entirety, except that subsequent clarifying amendments are to be considered." U.S.S.G. § 1B1.11, cmt. n.1 (2008 & 2015). Thus, the correct Guidelines Manual for Thomsen's entire resentencing, on remand, is the 2008 version.

### b. "Intended loss"

Thomsen claims the district court incorrectly calculated "intended loss" under U.S.S.G. § 2B1.1(b)(1). U.S.S.G. § 2B1.1(a)(1) provides for level increases for losses exceeding certain amounts in, *inter alia*, fraud cases. *See United States v. Gonzalez Becerra*, 784 F.3d 514, 516 n.2 (9th Cir. 2015) ("U.S.S.G. § 2B1.1(b)(1) sets out a schedule in which greater amounts of actual or intended monetary losses are coupled with correspondingly greater increases to a defendant's offense level."). A district court's method of calculating loss under the guidelines is reviewed *de novo*, and the determination of the loss amount is reviewed for clear error. *United States v. Aubrey*, 800 F.3d 1115, 1132 (9th Cir. 2015); *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1153–54 (9th Cir. 2012). A district court must make "a reasonable estimate of the loss based on available

information." *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007).

U.S.S.G. § 2B1.1(a)(1), cmt. n.3(A)(i)–(ii) (2008), explains that "loss is the greater of actual loss and intended loss" and how each kind of loss is determined. More importantly, here, when calculating loss amounts, the district court is allowed to consider all relevant conduct that is "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2) (2008); *United States v. Newbert*, 952 F.2d 281, 284 (9th Cir. 1991). This allows the court to include charged, uncharged, and even acquitted conduct in the determination of loss. *United States v. May*, 706 F.3d 1209, 1213 (9th Cir. 2013).

The primary flaw with the "intended loss" finding, here, is that the district court improperly considered the intended loss from the second case, which did not result in Thomsen's conviction, even though the second case did not involve "relevant conduct," because it was *not* "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2) (2008). Furthermore, the United States nowhere identifies *evidence* establishing— or identified by the district court as the basis for a finding— that specific challenged amounts of intended loss in the first case were, in fact, actual or intended losses. While there is copious evidence of some association between Thomsen and most of the allegedly fraudulent tax refunds claimed, that is not the same as copious evidence that each such refund, in fact, resulted in an actual or intended loss to the IRS. Under the circumstances, it is difficult to tell what the evidentiary basis for the $425,117 intended loss might be, beyond the prosecutor's statements to the probation officer. It is possible, however, to conclude that the district court clearly

erred in determining the amount of intended loss.  *Aubrey*,
800 F.3d at 1132.

Upon remand, the district court should make factual
findings supporting the amount of intended loss and apply the
appropriate enhancement pursuant to U.S.S.G. § 2B1.1(a)(1)
(2008).

### c.  The "identity theft" enhancement

Next, Thomsen argues that the district court erroneously
applied the identity theft specific offense characteristic under
U.S.S.G. § 2B1.1(b)(11)(C) (2008).  We agree.  The only
basis on which the Addendum recommended a two-level
enhancement pursuant to U.S.S.G. § 2B1.1(b)(11) (2008) was
pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i) (2008), as follows:

> The defendant used SSNs of others to file
> false tax returns and to obtain fraudulent tax
> refunds.  He also [used] his victim's [sic]
> SSNs to *produce other means of
> identification*, namely personal tax returns.

Addendum at 7 (emphasis in the original).[18]  The pertinent
part of the applicable guideline in the 2008 Manual is
U.S.S.G. § 2B1.1(b)(10) (2008), which provides, as follows:

> (11) If the offense involved . . . (C)(i) the
> unauthorized transfer or use of any means of

---

[18] The prosecution argues that the enhancement is proper on a variety of
other grounds, but has not identified any part of the record hinting that the
district court imposed a U.S.S.G. § 2B1.1(b)(11) (2008) enhancement on
any other ground.

identification unlawfully to produce or obtain any other means of identification. . . increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

U.S.S.G. § 2B1.1(b)(10)(C)(i) (2008). Application Note 9 to the 2008 version of this guideline defines "means of identification" for purposes of this guideline, as that term is defined 18 U.S.C. 1028(d)(7), with certain limitations. U.S.S.G. § 2B1.1, cmt. n.9 (2008). "Personal tax returns" are conspicuous by their absence from the list of "means of identification" in 18 U.S.C. § 1028(d)(7). The United States has not cited, and we have not found, any decision of this court or any other Circuit Court of Appeals holding that "tax returns" are "means of identification" within the meaning of either 18 U.S.C. § 1028(d)(7) or any version of U.S.S.G. § 2B1.1(b)(10)(C)(i) (now U.S.S.G. § 2B1.1(b)(11)(C)(i)).[19]

Thus, the "identity theft" enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C)(i) (2008) was improperly imposed.[20]

---

[19] Indeed, what case law we have found is to the contrary. *See United States v. White*, 571 F. App'x 20, 26 (2d Cir. 2014) (summary order) (holding that, where the defendant was convicted of using others' identifications to file false tax returns and to receive refunds, the district court did not find, nor did the PSR state, that using others' identifications to file a false return and receive a refund involved obtaining *another* means of identification within the meaning of U.S.S.G. § 2B1.1(b)(11)(C)(i)).

[20] Because we remand for resentencing, we need not address Thomsen's "double-counting" argument.

### d.   The "sophisticated means" enhancement

Thomsen also claims the district court incorrectly applied the "sophisticated means" enhancement, U.S.S.G. § 2B1.1(b)(9)(C) (2008).[21] We disagree. Here, as in *United States v. Augare*, 800 F.3d 1173, 1175–76 (9th Cir. 2015), Thomsen used "coordinated and repetitive steps" to effect his fraudulent scheme, comparable in "sophistication" to schemes held to warrant the enhancement. *Id.* Indeed, his scheme involved "dozens of various acts," including falsifying tax returns and checks, to conceal his false claims, *cf. United States v. Tanke*, 743 F.3d 1296, 1307 (9th Cir. 2014); using a bank account with a deceptive name to conceal income, which warranted the enhancement, even if the scheme was not "highly complex" and did not "exhibit exceptional brilliance," *cf. United States v. Jennings*, 711 F.3d 1144, 1145 (9th Cir. 2013); and even involved falsification of documents and left a "complicated and fabricated" paper trail to hide his fraud, *cf. United States v. Horob*, 735 F.3d 866, 872 (9th Cir. 2013) (*per curiam*). The district court properly imposed this enhancement.

### e.   The cross-reference

Next, Thomsen appeals the application of the U.S.S.G. § 2L2.2(c)(1)(A) cross-reference to U.S.S.G. § 2X1.1. This cross-reference resulted in the same base offense level and the same enhancements pursuant to U.S.S.G. § 2B1.1 for his

---

[21] Thomsen cites U.S.S.G. § 2B1.1(b)(9)(C) from the 2008 Guidelines Manual as the basis for this challenge. Although he concedes that there is no difference between the 2008 Guidelines and the 2013 Guidelines as to this or other aspects of his appeal, we noted, above, that the correct Guidelines Manual for Thomsen's entire resentencing is the 2008 version.

Group Two offense (Count 33) as for his Group One offenses (Counts 1–4, 7–16, and 17–24). Because we have vacated Thomsen's conviction on Count 33, the only count in Group Two, no cross-reference is applicable. The district court must recalculate the sentence upon remand.

### f. The "abuse of trust" enhancement

Thomsen's penultimate ground for appeal is that the application of the U.S.S.G. § 3B1.3 enhancement for "abuse of trust" was plain error. We disagree.

Thomsen is correct that the only basis on which the probation officer recommended the two-level enhancement for "abuse of trust" pursuant to U.S.S.G. § 3B1.3 (for both groups of offenses) was that "the defendant was a tax preparer, who was entrusted with the personal information of others, which he used for his own financial gain," which the probation officer believed "constitute[d] an abuse of a position of trust." We have repeatedly held that, "'[t]o support the abuse of trust enhancement, "a position of trust . . . must be established from the perspective of the victim."'" *United States v. Technic Servs., Inc.*, 314 F.3d 1031, 1048 (9th Cir. 2002) (quoting *United States v. Brickey*, 289 F.3d 1144, 1154 (9th Cir. 2002), in turn quoting *United States v. Hill*, 915 F.2d 502, 506 n.3 (9th Cir. 1990)), *overruled on other grounds by United States v. Contreras*, 593 F.3d 1135, 1136 (9th Cir. 2010) *(en banc)* *(per curiam)*; *see also United States v. White*, 270 F.3d 356, 371 (6th Cir. 2001) ("The abuse-of-trust enhancement may only be applied where the defendant abused a position of trust with the victim of his charged conduct."). Where Thomsen goes astray is in his assertion that the only "victim" in question is the IRS.

We have recognized that "victims of fraud are not limited to the entities that bear the ultimate financial burden, but also include those who bear emotional, financial and other burdens." *United States v. Peyton*, 353 F.3d 1080, 1091 (9th Cir. 2003) (concluding that American Express was not the only "victim" of a U.S. Postal Service supervisor who falsely procured American Express credit cards in the names of co-workers, but also those people named on the credit cards who were injured, because their credit histories were adversely affected). There was no plain error in application of the "abuse of trust" enhancement, here, where persons in whose names Thomsen filed fraudulent tax returns by using personal information provided to him in his employment as a tax preparer were subjected to emotional and other burdens as a result of his conduct. Thus, the district court properly applied the "abuse of trust" enhancement.

### g. The "obstruction of justice" enhancement

Thomsen lastly asserts that the district court erroneously applied a two-level enhancement for "obstruction of justice" under U.S.S.G. § 3C1.1. We disagree.

The Supreme Court has observed that, when applying an enhancement for "obstruction of justice" pursuant to U.S.S.G. § 3C1.1 for committing perjury, "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding," but "[t]he district court's determination that enhancement is required is sufficient . . . if, as was the case here, the court makes a finding of an obstruction of, or impediment to, justice that encompasses all of the factual predicates for a finding of perjury." *United States v. Dunnigan*, 507 U.S. 87, 95 (1993). Here, the district judge's findings in support of the "obstruction of justice"

enhancement based on Thomsen's false testimony encompassed not only falsity of the testimony and obstruction of justice, but other elements. *See id*. at 94 (stating the elements of perjury). The district judge encompassed intent to provide false testimony when he told Thomsen that he "d[idn't] understand how someone who can be this smart, this smart, could come up with the stories that you came up with while you were on the witness stand" to attempt to exonerate himself. His findings also encompassed materiality, because he found that the false testimony was intended to suggest that Thomsen was not the person who committed the offenses. Thus, the district court did not err in imposing this enhancement.

## D. Scope Of The Record On Remand

During oral argument, we requested that the United States confer with counsel for Thomsen about the scope of evidence that the district court may consider, on any remand, as to the number of victims under the 2008 Guidelines Manual. We have been notified that the parties have conferred and jointly agree that the record on remand as to the number of victims will be limited to the following: (1) the current record before the district court; (2) one additional government witness who will testify based upon the existing record; and (3) a summary chart that the witness may use to aid in his/her testimony. We find that the parties' request is reasonable, and grant it. *See, e.g.*, *United States v. Matthews*, 278 F.3d 880, 889 (9th Cir. 2002) ("[W]e conclude that there is no reason to limit the district court's authority to explore fully a factual issue at resentencing simply because it failed to do so during the first proceeding as a result of an erroneous legal ruling."). The record on remand shall be limited accordingly.

### *III. CONCLUSION*

We reverse the district court's denial of Thomsen's Motion For Judgment Of Acquittal as to Counts 33 and 34, and vacate those convictions. We reverse the order of restitution and sentence of incarceration, and remand for redetermination of both.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**